Raymond D. TEMPEST, Jr.

v.

STATE of Rhode Island.

No. 2015–257–M.P.

Supreme Court of Rhode Island.

July 14, 2016.

Michael Kendall, Pro Hac Vice, Lauren E. Jones, Esq., Matthew R. Turnell, Pro Hac Vice, Katherine Dyson, Pro Hac Vice, Betty Ann Waters, Esq., for Plaintiff.

Aaron L. Weisman, Department of Attorney General, for State.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

On July 13, 2015, the Providence County Superior Court vacated the conviction of Raymond "Beaver" Tempest Jr. (Tempest) for the 1982 homicide of Doreen Picard (Picard). On September 22, 2015, this Court granted the state's petition for a writ of certiorari. Before us, the state argues that the Superior Court erred in vacating Tempest's conviction on the basis

of two *Brady*[1] violations founded on the state's suppression of favorable evidence and a due process violation based on improper witness coaching by the Woonsocket Police Department. After careful review of the record and of the parties' written submissions and oral arguments, we affirm the judgment of the Superior Court and quash the writ of certiorari heretofore issued.

## I

### Facts and Travel

The facts of this case are altogether tragic, and the travel is anything but lackluster. We recite only those facts that are relevant to the instant appeal, and so invite the reader to consult our opinion in *State v. Tempest*, 651 A.2d 1198 (R.I.1995) for a more detailed discussion.

On February 19, 1982, at approximately 3:20 p.m., fifteen-year-old Lisa LaDue (LaDue)[2] came home to the triple-decker apartment at 409 Providence Street in Woonsocket, Rhode Island, which she lived in with her mother and step-father, Douglas Heath (Heath). LaDue testified that, upon arriving home, she walked around to the back of the house, where she noticed a "big maroon car" parked adjacent to the bulkhead leading into the cellar. When she entered through the back door of the house, she saw three-year-old Nicole Laferte (Nicole) crying, "saying her mother was downstairs sick." LaDue disregarded Nicole's behavior as simply a cry for attention because LaDue heard "some moving around downstairs[,]" so she went upstairs to wait for Heath to come home. Within a few minutes, she saw Heath pull into the driveway. Shortly thereafter, she heard Heath frantically call for her.

---

**1.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**2.** LaDue's maiden name is Wells.

Heath testified that he arrived home approximately ten minutes after LaDue. When he walked into the back hallway on the first floor of the multifamily home, he also encountered young Nicole, who was standing at the cellar door crying. Heath asked Nicole what was wrong, and Nicole replied that her mother was downstairs "lying down." Heath went down to the cellar, unprepared for the gruesome scene he was about to encounter—a body "basically sitting" between the washer and dryer, and a second body lying face down in a "puddle of blood." Both bodies had been beaten beyond recognition. The bodies would later be identified as those of Picard and Nicole's mother, Susan Laferte (Laferte). Picard was pronounced dead at approximately 4:30 p.m. the same day. Laferte miraculously survived the brutal attack; but, due to the injuries she sustained, her memory was significantly impaired.

Following what even the state described as a "chao[tic]," "disorder[ly]," and "disast[rous]" nine-year investigation by the Woonsocket Police Department, on June 5, 1991, a grand jury indicted Tempest for Picard's murder.[3] The case went to trial in April 1992, during which Heath, LaDue, and a number of other witnesses testified. Of these witnesses, four testified that Tempest had confessed to killing Picard.

Two such witnesses were John Guarino (Guarino) and his former girlfriend, Donna Carrier (Carrier).[4] Tempest and Guarino ran in the same circle of friends, and at one time they lived in the same apartment complex on Winter Street in Woonsocket. Guarino testified that, while they were out one night having drinks in late 1982 or early 1983, Tempest confessed to killing Picard. Although Guarino testified that at the time he did not take Tempest's confession "seriously," he nevertheless went home and told Carrier what Tempest had said. Guarino further testified that, several weeks later, Tempest—who Guarino said appeared "very, very nervous"—came to his apartment and told him he "better keep [his] mouth shut and not say anything to anybody." Tempest again told Guarino "that he did it" but that "they don't have any proof that he did it."

Carrier testified that she overheard this exchange between Guarino and Tempest. She stated that Tempest said that Picard "came down the stairs at the wrong time, saw him hitting [Laferte]" and that "[h]e couldn't let her get away and had to do her, too." Carrier also testified that Tempest said he was "very upset because [Laferte] was going to tell [his wife] something and that he and [his wife] had just gotten back together." Prior to trial, Carrier had been adamant that, at the time of the murder, the Tempest family lived in the same apartment complex on Winter Street as she and Guarino.

Two other witnesses testified that Tempest had confessed to killing Picard. The first was Ronald Vaz (Vaz), an acquaintance of Tempest, who had a long criminal record and who occasionally "snorted" cocaine with him.[5] Loretta Rivard, a prostitute with whom Tempest "part[ied]" one night in January 1988, also testified that Tempest took responsibility for the murder. To be sure, many of the state's wit-

---

3. No charges were ever filed against Tempest in connection with the attack on Laferte. The statute of limitations has long since run with regard to this assault.

4. Carrier's maiden name was Bousquet. By the time of Tempest's trial, Guarino and Car-

rier had separated and were no longer in contact with one another. Both have since passed away.

5. Carrier also testified that Vaz sold her and Guarino cocaine.

nesses were not model citizens. Indeed, the trial justice said the following about them:

"We didn't have a parade of MDs or [s]umma [c]um [l]audes here. We had people who deal in drugs, we have people who snort drugs and matters of that nature. * * * So we don't expect total intelligence here." *Tempest*, 651 A.2d at 1218.

Yet, the trial justice also noted that the court "must take the witnesses as they come." *Id.*

On April 22, 1992, a jury found Tempest guilty of murder in the second degree, and he was subsequently sentenced to eighty-five years in prison.[6] This Court affirmed his conviction on January 11, 1995. *Tempest*, 651 A.2d at 1220.

Nearly a decade later, on April 8, 2004, Tempest filed an application for postconviction relief pursuant to Rhode Island's Innocence Protection Act, G.L.1956 §§ 10–9.1–11 and 10–9.1–12[7] and sought the release of certain physical evidence (including, among other items, hair recovered from both victims of the attack, as well as fingernail clippings from Picard) for forensic testing. Over the next eleven years, many motions and memoranda were filed, various orders were entered, and discovery ensued. Finally, in April 2015, Tempest

filed a second amended application for postconviction relief, which is the operative application in the present appeal.

Following a lengthy hearing spanning the course of several weeks, the hearing justice issued a seventy-eight-page decision, in which he granted Tempest's application for postconviction relief and vacated his conviction. The hearing justice identified three grounds upon which Tempest was entitled to postconviction relief: two *Brady* violations based on the state's suppression of favorable evidence and a due process violation resulting from the Woonsocket Police Department's "unduly suggestive interviewing of witnesses[.]"[8] The state then petitioned this Court for a writ of certiorari, which was granted on September 22, 2015.[9]

## II

### Standard of Review

"[P]ost[ ]conviction relief is available to a defendant convicted of a crime who contends that his original conviction * * * violated rights that the state or federal constitutions secured to him." *Torres v. State*, 19 A.3d 71, 77 (R.I.2011) (quoting *Otero v. State*, 996 A.2d 667, 670 (R.I. 2010)). "An applicant who files an application for postconviction relief bears the bur-

---

**6.** Tempest filed a motion for a new trial, which the trial justice denied.

**7.** The Innocence Protection Act was enacted in 2002. General Laws 1956 § 10–9.1–11 governs the mandatory preservation of biological evidence, while § 10–9.1–12 governs the DNA testing of evidence.

**8.** Tempest's application also included claims for relief based on newly discovered evidence, the state's failure to disclose statements made by Vaz to police pertaining to unrelated crimes, the former prosecutor's presentation of allegedly perjured testimony, the state's failure to disclose exculpatory evidence per-

taining to the ownership of Vaz's farm at the time of the murder, ineffective assistance of counsel, and actual innocence. The hearing justice did not find any merit to these claims, and Tempest did not file a cross-petition for writ of certiorari asking this Court to review those findings.

**9.** In 2015, the General Assembly amended § 10–9.1–9, as amended by P.L. 2015, ch. 92, § 1, such that an aggrieved party may seek review of an order denying postconviction relief "by filing a petition for writ of certiorari in accordance with the [S]upreme [C]ourt [R]ules of [A]ppellate [P]rocedure within sixty (60) days of the entry of the final judgment."

den of proving, by a preponderance of the evidence, that such relief is warranted." *Rivera v. State*, 58 A.3d 171, 179 (R.I.2013) (quoting *Anderson v. State*, 45 A.3d 594, 601 (R.I.2012)).

■ "In reviewing an application for postconviction relief, '[t]his Court will not impinge upon the fact-finding function of a hearing justice * * * absent clear error or a showing that the [hearing] justice overlooked or misconceived material evidence in arriving at those findings.'" *State v. Thornton*, 68 A.3d 533, 539 (R.I.2013) (quoting *Anderson*, 45 A.3d at 601). However, "[w]e employ a *de novo* standard of review with regard to 'questions of fact or mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights * * *.'" *Id.* (quoting *Anderson*, 45 A.3d at 601). Nevertheless, even when conducting such a *de novo* review, "we still accord a hearing justice's findings of historical fact, and inferences drawn from those facts, great deference * * *." *Id.* at 540 (quoting *Anderson*, 45 A.3d at 601).

## III

### Analysis

On appeal, the state attacks each of the three grounds the Superior Court relied on in vacating Tempest's conviction. First, the state contends that the hearing justice erred in granting relief on Tempest's "maroon car" *Brady* claim because his claim was barred by laches and the evidence was not material. Next, the state argues that the hearing justice erred in vacating Tem-

pest's conviction on the basis of the former prosecutor's failure to disclose pretrial statements made by Carrier. Last, the state asserts that the hearing justice erred in determining that Tempest's due process rights were violated as a result of improper police practices. Because we can affirm the Superior Court's decision on any or all of these grounds, we start with the state's second claim of error, which we conclude is dispositive of the state's appeal.

### A. Carrier's Pretrial Statements[10]

■ Seventeen days before trial, Carrier provided the state's former prosecutor with two novel statements: (1) that Tempest's brother, Gordon Tempest (Gordon)—who was a detective with the Woonsocket Police Department at the time of the murder—hid the murder weapon (a pipe) in a closet on the first floor at 409 Providence Street in an effort to conceal it so as to protect his brother; and (2) that, on the day of the murder, Tempest's children were "excited" about getting a puppy.[11] In response to receiving these statements from Carrier, the former prosecutor wrote in his notes: "more new info re: [Gordon Tempest] putting pipe in closet + dog for the kids—too late—don't volunteer new info—will cause big problems." Tempest argues that the former prosecutor deliberately failed to disclose this favorable evidence, and that such a deliberate nondisclosure automatically entitles him to a new trial.

■ "In accordance with *Brady*, if a prosecutor has suppressed evidence that would be favorable to the accused and the

---

**10.** The Superior Court analyzed the state's laches defense as a complete bar to Tempest's postconviction relief action and ultimately rejected its argument. Before this Court, the state only argues laches as it applies to Tempest's "maroon car" *Brady* claim; because we do not reach the "maroon car" issue, we need

not address laches as it applies to that particular claim.

**11.** Although seemingly benign, the latter statement is relevant because Tempest and Laferte had agreed to mate their dogs and Tempest was to receive the pick of the litter.

evidence is material to guilt or punishment, the defendant's due-process rights have been violated and a new trial must be granted." *DeCiantis v. State,* 24 A.3d 557, 570 (R.I.2011) (quoting *State v. McManus,* 941 A.2d 222, 229–30 (R.I.2008)). With respect to such a failure to disclose, our jurisprudence "provides even greater protection to criminal defendants than the one articulated [by the United States Supreme Court]." *State v. Chalk,* 816 A.2d 413, 419 (R.I.2002) (quoting *Cronan ex rel. State v. Cronan,* 774 A.2d 866, 880 (R.I.2001)). "When the failure to disclose is deliberate, this [C]ourt will not concern itself with the degree of harm caused to the defendant by the prosecution's misconduct; we shall simply grant the defendant a new trial." *State v. Wyche,* 518 A.2d 907, 910 (R.I. 1986). Thus, instances of deliberate nondisclosure are "[t]he easy cases[.]" *Lerner v. Moran,* 542 A.2d 1089, 1092 (R.I.1988) (quoting *United States v. Keogh,* 391 F.2d 138, 146 (2d Cir.1968) (Friendly, J.)). We have said that "[t]he prosecution acts deliberately when it makes 'a considered decision to suppress * * * for the purpose of obstructing' or where it fails 'to disclose evidence whose high value to the defense could not have escaped * * * [its] attention.' " *Wyche,* 518 A.2d at 910 (quoting *Keogh,* 391 F.2d at 146–47).

To begin, we are not troubled by the terseness with which the hearing justice determined that the former prosecutor acted deliberately when he failed to disclose Carrier's pretrial statements. In

our opinion, he covered all of the necessary bases in his analysis. First, he appropriately articulated our jurisprudence surrounding this issue. He even noted the former prosecutor's purported reason for not offering the information to the defense: because he felt "it would lead to a continuance and to headaches." The hearing justice then cited caselaw to support his contention that "[c]onstitutional rights cannot be tossed aside whenever they present the smallest inconvenience[,]" and concluded that the former prosecutor's " 'considered decision to suppress' [the statements] automatically necessitates relief." (Quoting *DeCiantis,* 24 A.3d at 570.) Furthermore, the former prosecutor's own words—"don't volunteer"—indicate a considered decision not to offer the new information to the defense.[12] While the hearing justice's analysis of this particular issue was admittedly brief—it spanned only two-and-one-half pages of a seventy-eight-page opinion—the length of the analysis is not a factor when determining the merits of his ruling. The hearing justice succinctly analyzed the issue, and we discern no clear error in his finding that the former prosecutor deliberately suppressed Carrier's new statements. *See Thornton,* 68 A.3d at 539.

Moreover, it is our opinion that the "high value" of Carrier's new statements to the defense could not have escaped the former prosecutor's attention; thus, for this reason as well, his failure to disclose

---

**12.** The dissent accuses the majority of making improper factual determinations, especially as it pertains to the meaning and intent of the former prosecutor's words "more new info re: [Gordon Tempest] putting pipe in closet + dog for the kids—too late—don't volunteer new info—will cause big problems." In doing so, the dissent makes its own factual determination that the former prosecutor was only referring to the fact that the new statements could be cause for a continuance,

which was nothing more than the former prosecutor's effort to avoid his prosecutorial dilemma. Furthermore, in finding that the former prosecutor deliberately failed to disclose the information, the hearing justice clearly rejected the former prosecutor's proffered reason for failing to disclose the information. Such a factual finding is entitled to deference from this Court on appeal. *See State v. Thornton,* 68 A.3d 533, 539–40 (R.I. 2013).

the statements constitutes a deliberate nondisclosure. *See Wyche*, 518 A.2d at 910 ("The prosecution acts deliberately when it makes 'a considered decision to suppress * * * for the purpose of obstructing' *or* where it fails 'to disclose evidence whose high value to the defense could not have escaped * * * [its] attention.'" (emphasis added) quoting *Keogh*, 391 F.2d at 146–47). Specifically, when Carrier made the statements in question, the former prosecutor was at least aware that there was an issue (albeit perhaps unresolved) with regard to Carrier's assertion that Tempest lived in the same apartment complex as she and Guarino at the time of the murder. Three months prior to receiving the statements at issue, in December 1991, Pamela Miclette (Miclette), the Tempests' babysitter, indicated that the Tempest family was living on Phoebe Street at the time of the murder, not on Winter Street where Carrier and Guarino lived.[13] At some point just before trial, the former prosecutor definitively found out that Carrier was in fact mistaken as to where Tempest lived at the time of the murder. Having realized that it was of high value to the defense because it seriously discredited much, if not all, of Carrier's testimony about seeing Tempest on the day of the murder, the former prosecutor disclosed Carrier's mistake to the defense. However, in doing so, he failed to also disclose Carrier's new statements recorded in his March 10, 1992 note about Gordon and about the children being excited over the puppy on the morning of the murder.

■ The state argues that Carrier's statement with regard to Gordon concealing the murder weapon was not new, but rather was cumulative of other statements Carrier made that had already been dis-

closed to the defense. This argument is not persuasive. At the outset, we note that the former prosecutor twice identified Carrier's statements as "new." The hearing justice also found that the statements were new, and we do not think he clearly erred in so determining. *See Thornton*, 68 A.3d at 539. Indeed, our own review of the evolution of Carrier's statements leads us to this same conclusion.

From her initial statement to police in February 1987 through her testimony at trial, Carrier maintained that Tempest had said that Gordon was unaware of his involvement in Picard's murder. Carrier first spoke to the police in February 1987, at which time she said that Tempest told her that Gordon knew nothing about his involvement in the murder and that, if Gordon did find out, he would turn Tempest in. She confirmed her statement during the grand jury hearing on November 30, 1990. While Carrier did indicate that Tempest told her that "everything ha[d] been taken care of[,]" she went on to say that Tempest told her that "my father is an important man" and that "it cost a lot of money for my father to make sure my name didn't get brought up in this." She also again confirmed that Tempest told her: "If my brother Gord[on] knew, he would turn me in."

Similarly, at Tempest's bail hearing in June 1991, in response to the former prosecutor's question as to whether Tempest had ever said anything about "whether he expected to be prosecuted" for Picard's murder, Carrier replied:

> "[Tempest] said he didn't think anything would come of it because his father was the High Sherriff [*sic*] of Providence and his brother was the Detective on the

---

13. There is no dispute as to whether Miclette's statement was timely and appropriate- ly disclosed to the defense.

Woonsocket Police Force. He said *if he told his brother Gord[on]*, Gord[on] would go to the police and tell them what they knew, and that the murder weapon was not there, it wasn't available, and that all fingerprints were taken care of." (Emphasis added.)

Thus, Carrier still maintained that Tempest had told her that Gordon was not aware of his involvement in Picard's murder.

Carrier's witness statement on August 26, 1991, was a bit more vague, but it still did not specifically indicate that Gordon knew about Tempest's involvement in the murder or that he participated in a cover-up. She stated that "[Tempest] said, 'I won't get caught, my father and brother won't let me get caught. The weapon's been all taken care of, he said.' " At trial, Carrier continued to maintain that Tempest said that "his brother didn't know [about his involvement in Picard's murder], but his father did" and that "[h]is father had paid off a large sum of money to make sure that [Tempest's] name was never mentioned * * *." She then testified that Tempest told her that "[t]he murder weapon would never be found [and that] it had been wiped clean of fingerprints and gotten rid of."

Now turning to the statement in question, it is clear that Carrier dramatically changed her story both as it pertained to her understanding of Gordon's knowledge of Tempest's involvement in Picard's murder as well as any involvement Gordon may have had in concealing the murder weapon. At Tempest's postconviction-relief hearing, the former prosecutor testified that Carrier told him in March 1992—mere days before trial—that "Gordon Tempest had put the pipe in the closet" at 409 Providence Street, where it was ultimately found by police. We deem this a significant modification from Carrier's pre-vious statements and trial testimony, in which she stated not only that Tempest told her that Gordon was unaware of his involvement in Picard's murder, but which also seemed to indicate that it was Tempest's *father* who helped him cover up his involvement in the crime.

The state pushes back and argues that Carrier's statement regarding Gordon's knowledge and involvement was not exculpatory, but rather was inculpatory, inasmuch as it lent itself to the theory that Tempest committed the murder and Gordon helped him cover it up. While the substance of Carrier's statement regarding Gordon hiding the pipe may have been inculpatory, the statement nonetheless could have been used to impeach her credibility. The United States Supreme Court has unequivocally stated that "[i]mpeachment evidence * * * as well as exculpatory evidence, falls within the *Brady* rule," *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and that facially inculpatory evidence can be used to impeach a witness. *See Strickler v. Greene,* 527 U.S. 263, 282 n. 21, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ("We reject [the] respondent's contention that these documents do not fall under *Brady* because they were 'inculpatory.' Our cases make clear that *Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness."). "Such evidence is 'evidence favorable to an accused,' * * * so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375. Here, Carrier's new statement about Gordon's involvement in a cover-up, though perhaps inculpatory on its face, certainly could have been used by the defense to undermine her already shaky credibility.

Carrier's statement with regard to Tempest's children being excited about getting a puppy was also novel, and the state does little to belie this assertion. In her grand jury testimony, Carrier did mention that Tempest was "supposed to pick up a pitbull puppy from * * * either Doreen Picard or Sue Laferte" on the day of the murder. Yet, Carrier had never before offered that, on the morning of Picard's murder, Tempest's children were excited about getting a puppy.

Her statement that Tempest's children were excited about the prospect of getting a puppy on the morning of Picard's murder also clearly had impeachment value. It had already been established that Carrier's recollection was mistaken as to when Tempest and his family moved into the apartment complex where she and Guarino lived—the Tempests did not move into their apartment complex on Winter Street until 1983, the year after the murder—meaning that it was unlikely, if not altogether impossible, that Carrier could have seen Tempest's children on Winter Street on the morning of the murder. Yet, mere days before trial, Carrier still continued to assert that she saw Tempest and his family on that day. Moreover, it was undisputed that John Allard, a friend of Tempest, was to be the recipient of the puppy in question.[14]

Given that the evidence in the state's case was nearly entirely circumstantial, "[t]he outcome * * * hinged on whom the jury believed[.]" *State v. Haslam,* 663 A.2d 902, 909 (R.I.1995). Thus, had Carrier's newly offered, inconsistent, and factually very dubious statements been disclosed to the defense, and had they been used effectively to further undermine Car-

rier's already questionable credibility, they "may [have made] the difference between conviction and acquittal." *Bagley,* 473 U.S. at 676, 105 S.Ct. 3375.

Last, the state argues that the statements were not material. However, the materiality of the evidence is not germane when the prosecution's failure to disclose the evidence is deemed to be deliberate. *McManus,* 941 A.2d at 230. Yet, even if a showing of materiality were required, Tempest could satisfy this burden. *See DeCiantis,* 24 A.3d at 571 ("[T]he applicant 'bears the burden of establishing * * * that the nondisclosed evidence was material * * *.'" quoting *Chalk,* 816 A.2d at 419).

"Under the *Bagley* standard of materiality, '[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Lerner,* 542 A.2d at 1091 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375). To be clear, Tempest "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Wearry v. Cain,* —— U.S. ——, 136 S.Ct. 1002, 1006, 194 L.Ed.2d 78 (2016) (quoting *Smith v. Cain,* —— U.S. ——, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012)). Rather, "[a] 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Lerner,* 542 A.2d at 1091 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375).

As we have already pointed out, the suppressed statements could have been used to impeach Carrier's testimony even further. Carrier was one of four less-than-stellar witnesses (and arguably the

14. Notably, in his testimony at Tempest's postconviction-relief hearing, in response to petitioner's question asking whether he knew that the statements could be used to "cross[-examine] Carrier[,]" the former prosecutor admitted: "If you look at it that way, it was inculpatory—exculpatory."

most credible of the four) who testified that Tempest confessed to the murder. Had her testimony been further undermined, and her credibility perhaps crushed altogether, certainly there is, at the very least, a reasonable probability—one "sufficient to undermine confidence in the outcome"—that the verdict against Tempest would have been different. *See Wearry*, 136 S.Ct. at 1006 (holding that "[b]eyond doubt, the newly revealed evidence suffices to undermine confidence in [the] conviction" when a witness's credibility, "already impugned by his many inconsistent stories, would have been further diminished" by the revelation). Contrary to what the dissent suggests, whether the defense would have actually used the statements is not relevant to our analysis—the bottom line is that it should have been defense counsel's choice to make.

### B. The State's Remaining Claims

 Because we find the former prosecutor's deliberate failure to disclose Carrier's pretrial statements to be dispositive of the state's appeal, it is the only issue that warrants addressing in our opinion.[15] *See Grady v. Narragansett Electric Co.*, 962 A.2d 34, 42 n. 4 (R.I.2009) (reiterating our "usual policy of not opining with respect to issues about which we need not opine").

## IV

### Conclusion

 In coming to our decision today, we are cognizant of the fact that, thirty-four years ago, two young women were brutally beaten, and we remain mindful of the impact that this ordeal has had on the victims and their families. Yet, our justice system requires that the state bear the burden of proving every element of a crime beyond a reasonable doubt, *see, e.g., State v. O'Brien*, 774 A.2d 89, 100 (R.I. 2001), and it must do so within the confines of the law. When the state exceeds those confines, it must suffer the consequences.

Tempest has met his burden of proving by a preponderance of the evidence that postconviction relief is warranted. *See Rivera*, 58 A.3d at 179. Accordingly, we affirm the Superior Court's judgment vacating Tempest's conviction and quash the writ of certiorari heretofore issued. The materials associated with this case may be remanded to the Superior Court.

Chief Justice SUTTELL, concurring in the result and dissenting in part.

I concur with the majority's holding that the Superior Court order vacating Tempest's judgment of conviction should be affirmed, however, I depart from its reasoning. Rather, I agree with the conclusion of my dissenting colleague that the hearing justice failed to make the necessary findings of fact to support his ruling that the state made a deliberate decision not to disclose the statements of Donna Carrier.

It is my opinion that the hearing justice did not make a clear finding that the

---

15. The dissent and concurrence admonish the majority for not taking the opportunity to provide "guidance" to the Superior Court regarding Tempest's due process claim. However, doing so would be fruitless. First, if we were to decide Tempest's due process claim on the basis of *res judicata*, such a determination would only be applicable to this particular postconviction relief action, and thus would have no effect on retrial. Further, were we to opine on the merits of the claim, our discussion would amount to nothing more than dicta. As Chief Justice Roberts has aptly stated, "the cardinal principle of judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more[.]" *PDK Labs., Inc. v. Drug Enforcement Administration*, 362 F.3d 786, 799 (C.A.D.C.2004) (Roberts, J., concurring in part and concurring in judgment). In recognition of this "cardinal principle," we decline to address the issue.

state's failure to disclose statements made by Carrier was "deliberate" in line with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, nor can such a finding be inferred. Although the hearing justice properly cited *Lerner v. Moran*, 542 A.2d 1089, 1092 (R.I.1988), when he defined "deliberate [non-disclosure]" as "a considered decision to suppress[,]" he completely omitted the second half of that definition. "Deliberate," in the *Brady* context and in *Lerner*, is defined as "a considered decision to suppress, *taken for the very purpose of obstructing." Id.* (quoting *United States v. Keogh*, 391 F.2d 138, 146–47 (2nd Cir. 1968) (emphasis added)). There was testimony from the former prosecutor at the postconviction-relief hearing that tended to negate the contention that his purpose was to obstruct and there was nothing in the hearing justice's decision to support any inference that he discredited the former prosecutor's testimony in this respect. To the contrary, as the majority points out, the hearing justice "even noted the former prosecutor's purported reason for not offering the information to the defense: because he felt 'it would lead to a continuance and to headaches.'" Lacking credibility determinations, therefore, the hearing justice's decision does not adequately support the proposition that the former prosecutor's failure to disclose the Carrier statements was "a considered decision to suppress, *taken for the very pur-*

*pose of obstructing,"* or that the high value of the statements to the defense "could not have escaped the [state's] attention." [1] *Lerner*, 542 A.2d at 1092 (quoting *Keogh*, 391 F.2d at 146–47) (emphasis added); *see DeCiantis v. State*, 24 A.3d 557, 572 (R.I. 2011) ("we are satisfied that we can infer from the hearing justice's credibility determination that he did not find any *deliberate* nondisclosure on the part of the prosecution"). The equivocal nature of the former prosecutor's testimony in this regard is emphasized in the hearing justice's conclusion that "[b]y deciding not to disclose the newly arisen variations in [Carrier's] story, [the former prosecutor] evidently sought to protect * * * [her] from additional impeachment."

Accordingly, in my opinion, the majority at the very least should remand with instructions for the hearing justice to apply the proper standard and make credibility findings as it relates to the former prosecutor's testimony.[2] *See Butterfly Realty v. James Romanella & Sons, Inc.*, 45 A.3d 584, 591 (R.I.2012) (case remanded for factual findings due to inconsistencies within the Superior Court decision). I do not advocate for such a remand, however, as I concur with the majority's holding affirming the hearing justice's decision to set aside Tempest's conviction. I do so in reliance on the hearing justice's ruling that the state's failure to disclose certain evidence relating to the "maroon car" constituted a *Brady* violation.[3]

---

1. A "suppression" is also "deliberate" when there is "a failure to disclose evidence whose high value to the defense could not have escaped the prosecutor's attention." *Lerner v. Moran*, 542 A.2d 1089, 1092 (R.I.1988) (quoting *United States v. Keogh*, 391 F.2d 138, 147 (2nd Cir.1968)). However, because the hearing justice did not consider this second definition provided in *Lerner* when discussing the statements of Donna Carrier—by completely failing to articulate it in his written decision *and* by failing to make findings relative there-

to—it is my opinion that neither should this Court.

2. In my judgment the dissenting opinion suffers from the same malady as the majority by making credibility determinations.

3. I am also of the opinion that this Court should address the issue of improper police procedures and hold that the hearing justice erred in granting postconviction relief based upon this ground.

## I

### Facts and Travel Relating to the Maroon Car

I begin by summarizing the facts relating to the maroon car *Brady* claim. John McMann owned a maroon Buick at the time of the February 19, 1982 murder. The maroon car was registered at that time to Lee's Pharmacy, a store of which John McMann was part-owner. In 1983, John McMann sold the maroon car to Robert Monteiro. At the time of the sale, Lee's Pharmacy purchased a blue Buick to replace the maroon Buick that Monteiro had purchased.

At Tempest's criminal trial, the state presented a witness, Lisa LaDue, who resided in the second-floor apartment of 409 Providence Street. LaDue testified that on the day of the murder she observed a maroon car parked in the driveway of 409 Providence Street when she arrived home at approximately 3:20 p.m.[4] She also testified that upon entering the triple-decker apartment, she had "heard some moving around downstairs," but that she had proceeded up the stairs to her apartment. Moreover, LaDue's stepfather, Douglas Heath, testified that there was no vehicle in the driveway of 409 Providence Street when he arrived around 3:30 p.m. that day.

Significantly, Sherri Richards, Tempest's sister-in-law, testified at trial that she observed Tempest between 4:30 and 4:45 p.m. in front of her house on the day of the murder standing next to the maroon car with Monteiro. She testified that Monteiro "used to borrow" the car from Kevin McMann and that "[h]e would later on purchase the car but not at that time.".[5] This portion of Richards' testimony—that Monteiro borrowed the car from Kevin McMann—went uncontested at trial. The defense sought to impeach the witnesses who linked Tempest to "Monteiro's" maroon car on the day of the murder by presenting Martin Leyden, an employee of the Rhode Island Division of Motor Vehicles (DMV), who testified that Monteiro did not yet own the maroon vehicle at the time of the murder and that neither Monteiro nor his wife had any vehicle registered in their names until 1983. Additionally, the state presented Ronald Vaz, who testified that Tempest had confessed to fleeing the crime scene in "Monteiro's car."

In 2000 or 2001, a private investigator hired to work on Tempest's case discovered a hand-written letter from John McMann in defense counsel's case file. The letter read:

"To whom it may concern:

"Enclosed, find a copy of a Bill of sale, for a 1983 Buick, purchased for Lee's Pharmacy Inc. on May 27, 1983.

"The sale of my red Buick to the Monteiro's [*sic*] took place after I received my new car.

"There is no way, I was without a car, before I picked up my new one.

"Respectfully,.

"John J. McMann Jr."

Then, in December 2012, the law firm of McDermott Will & Emery, LLP, which

---

4. On cross-examination, LaDue testified that the first time she ever told anybody that she had seen a maroon car was "a couple of weeks" before the commencement of trial, more than ten years after the murder. She indicated that that was the first time she remembered a maroon car.

5. Richards had originally claimed that Monteiro owned the maroon car. However, prior to trial, Richards gave a witness statement where she stated: "I know the car I saw [Monteiro] in was the one that [Monteiro] bought from Lee's and that I had seen him driving around in that car several times at that time and that is why I thought he already owned it."

had agreed to assist the New England Innocence Project (the NEIP) in preparing Tempest's application for postconviction relief, hired an investigator, John Cinotti, to work on Tempest's case. Cinotti met with John McMann's adult children, Kevin McMann and Sharon McMann–Morelli. Kevin McMann provided an affidavit to the investigator attesting that "[p]rior to the sale in 1983, [John McMann] never lent his car to * * * Monteiro, nor did [Kevin McMann] ever lend [his] father's car, or any other car, to * * * Monteiro." At the postconviction-relief hearing, McMann–Morelli testified that she never observed John or Kevin McMann lend the maroon Buick to Monteiro at any time before Monteiro purchased it in 1983. McMann–Morelli testified that her father, John McMann, had told her that he had gone to the Woonsocket Police Department to inform the police that he had never lent the maroon car to anyone. John McMann had done so at some point during the trial after reading in the newspaper that his car had been referenced in testimony. Kevin McMann also testified that he had never lent the maroon car to anyone and that he had also gone to the Woonsocket Police Department during Tempest's trial with this information.

In his amended application for postconviction relief, Tempest claimed that his due process rights were violated by the state's failure to disclose to the defense that John McMann and Kevin McMann had informed the Woonsocket Police Department that neither had ever lent the maroon Buick to Monteiro. Tempest claimed that this failure to disclose constituted a constitutional due process violation because the McManns' statements were exculpatory evidence that the defense could have used

to impeach Richards' trial testimony that Monteiro would borrow the maroon car from Kevin McMann. Tempest argued that the evidence was also material as the maroon car was "the only thing" that tied Tempest to the crime scene during the time of the murder.

In response, the state raised the affirmative defense of laches, claiming that Tempest failed to timely pursue postconviction relief. Alternatively, the state maintained that there was no *Brady* violation because there was no direct evidence that the conversation between the McManns and the Woonsocket Police Department ever occurred. The hearing justice disagreed. He found that the state had failed to establish the affirmative defense of laches because Tempest's delay in seeking postconviction relief was "reasonable—not 'inexcusable' or 'unexplained,'" and the hearing justice also found that a *Brady* violation had in fact occurred.[6] Accordingly, as noted by the majority, the hearing justice entered an order vacating Tempest's conviction relying in part on the maroon car *Brady* violation.

On appeal, the state's argument that the hearing justice erred in vacating Tempest's conviction based on the maroon car *Brady* claim is two-fold. First, the state argues that the doctrine of laches should have prevented Tempest from litigating the maroon car *Brady* claim altogether because his delay in seeking postconviction relief was unreasonable and prejudicial to the state. Second, the state argues that, even if the laches defense does not apply, any evidence that the McManns did not lend the maroon car to Monteiro was not "material" pursuant to *Brady*. I address these arguments separately herein.

6. More specific findings made by the hearing justice are discussed as they become pertinent to my analysis of the *Brady* claim.

## II

### Laches

To establish a laches defense, "the state has the burden of proving by a preponderance of the evidence that [(1)] the applicant [was] unreasonably delayed in seeking relief *and* [(2)] that the state is prejudiced by the delay." *Raso v. Wall*, 884 A.2d 391, 395, 396 (R.I.2005). These issues are questions of fact dependent on the circumstances of a particular case, *id.* at 396, and a reviewing court has discretion to weigh the equitable laches defense. *Hazard v. East Hills, Inc.*, 45 A.3d 1262, 1270 (R.I.2012). It is well settled that "time lapse alone does not constitute laches." *Rodriques v. Santos*, 466 A.2d 306, 311 (R.I.1983). Because "the application of the defense of laches is generally committed to the discretion of the trial justice," *School Committee of Cranston v. Bergin–Andrews*, 984 A.2d 629, 644 (R.I. 2009) (quoting *O'Reilly v. Town of Glocester*, 621 A.2d 697, 703 (R.I.1993)), this Court "will not reverse the trial justice's decision on what constitutes laches on appeal 'unless it is clearly wrong.'" *Id.* (quoting *Arcand v. Haley*, 95 R.I. 357, 364, 187 A.2d 142, 146 (1963)).

### A

### Reasonableness of the Delay

Beginning with the first prong of the laches defense, the hearing justice found that the state had failed to prove that Tempest's delay in seeking postconviction relief was unreasonable. Given the "myriad issues developed as potential claims * * * as well as the scope and complexity of the case as a whole," the hearing justice determined that "the most balanced and equitable approach" to determining whether the laches defense applied was "to examine * * * Tempest's general course of conduct over the past twenty years." Although not bearing the burden of proof,[7] Tempest presented evidence at the postconviction-relief hearing to establish that his delay in pursuing postconviction relief was reasonable, including his own testimony and that of Martin Yant, Evelyn G. Munschy, Betty Anne Waters, Esq., and Gretchen Bennett, as well as an affidavit from Michael Kendall, Esq., a partner at McDermott Will & Emery. Based on the evidence presented at the postconviction-relief hearing, the hearing justice made extensive findings of fact concerning Tempest's conduct throughout the twenty years between his criminal conviction and the latest amendment to his application for postconviction relief.[8]

The hearing justice found that, following Tempest's conviction, Tempest lacked the funds to hire a postconviction-relief attorney. He found that, as a result, Tempest wrote several letters to James McCloskey, a minister who directed an innocence project in New Jersey, seeking his assistance. The hearing justice found that Minister McCloskey informed Tempest that he could not assist in his application for postconviction relief because his case was "too much of a case for [McCloskey] to handle."

---

7. The state has the burden of proof to invoke its laches defense, however, in *Hazard v. East Hills Inc.*, 45 A.3d 1262, 1271 (R.I.2012), we held that "it was incumbent upon [the] plaintiff to come forth with a fair explanation of the reason for the delay" where the plaintiff had waited nearly a *century* before filing her claim and the defendant sought to invoke a laches defense.

8. Over twenty years had passed since Tempest's conviction was affirmed by this Court in January 1995 and his second amended complaint seeking postconviction relief was filed in April 2015, which added several claims, including the maroon car *Brady* claim. *See State v. Tempest*, 651 A.2d 1198 (R.I.1995).

He found that Tempest also worked alongside Munschy, who was a second-mother figure to Tempest, and who, despite not being an attorney, had expended a significant amount of time examining Tempest's case files and looking into issues surrounding his case. Furthermore, the hearing justice found that Munschy and Tempest's sister, Barbara Small, had each spent substantial sums of their personal money to hire a private investigator, Martin Yant, to investigate Tempest's case beginning in 2000. The hearing justice found that Yant worked extensively on the case, billing over two hundred hours, but that the investigation ceased eighteen months later when Munschy could no longer afford to pay for Yant's services.[9]

Moreover, he found that Munschy wrote to Attorney Waters in 2001 and to the NEIP repeatedly from 2001 to 2004 seeking representation for Tempest. He found that Attorney Waters was volunteering at the NEIP when the NEIP agreed to review Tempest's case and that Attorney Waters did "the ground work looking for evidence, talking to people in Rhode Island [while the NEIP] w[as] in charge of all the paperwork" and filings. He further found that Attorney Waters filed a petition for deoxyribonucleic acid (DNA) testing on behalf of Tempest in 2004 and that the last DNA result came in 2015 and "form[ed] the body of a core claim within [Tempest's] petition—newly discovered evidence." Additionally, the hearing justice found that 2009 was the first time "the NEIP expanded its case review to include evaluation of non-DNA postconviction issues."

Furthermore, the hearing justice found that the "substantial costs and attorney hours expended by McDermott Will & Emery as well as the NEIP demonstrate[d] the expanse of resources necessary to properly delve into such an investigation."[10] He found that the state had contributed to the delay in Tempest's application by seeking continuances and objecting to Tempest's request for DNA testing, and that the state had failed to present any evidence that, had Tempest previously sought a public defender to file his postconviction-relief application, the Office of the Public Defender would have been able to litigate these claims faster than Tempest's attorneys at McDermott Will & Emery and at the NEIP. Only "[a]fter consideration of the testimony and exhibits outlining the efforts of * * * Tempest to develop a comprehensive, multi-claim postconviction[-]relief petition," did the hearing justice find that "Tempest's delay was not unreasonable, and, as a result, [that] the [s]tate's defense of laches fail[ed]." The hearing justice considered the "overriding interests of justice" and concluded that the state had failed to show that it would be inequitable to allow Tempest to enforce his legal rights, especially in light of Tempest's allegations that the state had "manipulate[d] witness statements and physical evidence" in his criminal case.

All of the findings of fact made by the hearing justice are clearly supported by the evidence presented at the postconviction-relief hearing.[11] Notably, the state

9. The hearing justice also found that, although Yant was no longer officially working on Tempest's case, Munschy stayed in contact with Yant and he would assist when possible.

10. An affidavit was submitted by Attorney Kendall outlining the work performed by his firm in Tempest's case. He attested that McDermott Will & Emery, LLP, worked on a pro bono basis alongside the NEIP beginning in 2012. He estimated that roughly 6,000 hours were spent working on this case.

11. I agree, however, with the dissent that the state's failure to present evidence that Tempest sought the assistance of the Office of the Public Defender or appointed counsel was an

does not challenge any of these findings—put differently, there is no allegation that any of the specific findings of Tempest's conduct are clearly erroneous or not supported by the record. Instead, the state argues that the trial justice's ultimate denial of its laches defense was erroneous because Tempest's delay was unreasonable as he had been on notice since 1992 that McMann could not have lent Monteiro the maroon car. The state argues that Tempest "took absolutely no legal or other action with respect to uncovering [this claim] and bringing it as a basis for post[ ]conviction relief." The state's argument fails in my opinion for several reasons.

First, the state's position ignores the lens through which the hearing justice considered the laches issues—he examined Tempest's overall conduct and did not undertake a claim-by-claim laches analysis. Although the state suggests in a footnote that the hearing justice's laches determination should have parsed out the complex claims from the "uncomplicated" claims such as the maroon car *Brady* claim, the hearing justice was in the best position to determine how to address the laches defense based on the circumstances of this particular case, and I see no error in his approach. Indeed, his method in addressing the laches defense was especially appropriate given that the state had originally sought to invoke the laches defense against all the claims in Tempest's application for postconviction relief.

Nevertheless, even when reviewing the proposed laches defense specifically as it relates to the maroon car *Brady* claim, there is ample evidence in the record before this Court and findings made by the hearing justice to support his denial of such defense. There was testimony at the postconviction-relief hearing that Tempest became aware of the McManns' statements to the Woonsocket Police Department regarding the maroon car in late 2013 when his private investigator approached Kevin McMann. At that time, Kevin McMann signed an affidavit attesting that neither he nor his father had ever lent the maroon car to Monteiro, and that they communicated this to the Woonsocket Police Department. Moreover, Kevin McMann testified at the postconviction-relief hearing that he never discussed what he disclosed to the police (regarding the maroon car) with Tempest or with any attorneys or investigators prior to meeting with Tempest's investigator in 2013.

The evidence the state relies on and claims was available to Tempest *prior to this 2013 interview* with Kevin McMann and McMann–Morelli is unavailing. The handwritten letter from John McMann contained in defense counsel's file, which the state relies on for its assertion that Tempest was on notice, could, at best, have informed Tempest that John McMann would not have *sold* his vehicle to Monteiro and been "without a car" prior to 1983. This letter does not, however, indicate, let alone set forth, that neither John McMann nor Kevin McMann ever *lent* the maroon car to Monteiro in 1982. The letter also made no indication that John McMann or Kevin McMann actually had gone to the Woonsocket Police Department with this information. Accordingly, when this letter was discovered in Tempest's file in 2001, it could not have placed Tempest on notice of a possible *Brady* claim.

Additionally, there was evidence before the hearing justice that Tempest has always maintained his innocence and that he, with the assistance of family and friends,

---

inappropriate consideration in a laches analysis. If Tempest were financially eligible, he

would have been entitled to such representation.

has always actively sought some form of postconviction relief. Munschy testified that she and Small initially hired a private investigator in 2000 because they both felt that they needed to uncover more material to present to an attorney. Bennett, a volunteer at the NEIP, testified, and the hearing justice found her testimony credible, that cases of this magnitude can take many years to properly litigate postconviction-relief issues. Moreover, Rhode Island law, as codified in G.L.1956 § 10–9.1–8, provides that:

> "All grounds for relief available to an applicant at the time he or she commences a proceeding under this chapter must be raised in his or her original, or a supplemental or amended, application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such a ground for relief."

Therefore, it is my opinion that the hearing justice was not clearly wrong in finding that Tempest's delay was not unreasonable where there is ample evidence to support a finding that Tempest actively sought additional grounds for relief and that a premature filing of a postconviction-relief application could have barred future claims. *See Ramirez v. State*, 933 A.2d 1110, 1112 (R.I.2007) (the defendant was precluded from raising new issues in his third application for postconviction relief, where § 10–9.1–8 requires that all grounds for relief be raised in the initial postconviction-relief application, and the defendant failed to establish a reason why his claims could not have been raised in his first application).

In my opinion, the hearing justice's findings as they relate to the reasonableness of Tempest's delay were all supported by the evidence presented at the postconviction-relief hearing. His ultimate conclusion that "the twenty-year period associated with the pursuit of this petition for postconviction relief was * * * reasonable—not 'inexcusable' nor 'unexplained'" was also supported by the record, well within his discretion, and not otherwise clearly wrong.

## B

### Prejudice to the State

The state also argues that the hearing justice erred in finding that it was not prejudiced by Tempest's delay. Notably, however, the laches defense is a two-prong analysis necessitating that the hearing justice find *both* that the applicant's delay was unreasonable *and* that the state was prejudiced by the delay. *Raso*, 884 A.2d at 395. Because, as previously noted, there is ample evidence to support the hearing justice's finding that Tempest's delay was not unreasonable—and consequently that the state failed to meet the first prong of the laches defense—a discussion of the second prong is not necessary.

It is my opinion that the hearing justice's thorough analysis of the laches defense does not warrant a reversal. As this Court has previously noted, "'[t]he standard of abuse of discretion is one that gives extreme deference to the [hearing] justice's determination'" and "we may uphold a [hearing] justice's ruling even if we would have ruled differently had we been in the [hearing] justice's position." *State v. Gillespie*, 960 A.2d 969, 980 (R.I.2008) (quoting *State v. Remy*, 910 A.2d 793, 797 (R.I.2006)). Accordingly, it was within the hearing justice's discretion to weigh the evidence presented by both the state and

Tempest, and to reach the outcome that he did; I discern no clear error in his conclusion that the state failed to prove the requisite elements of the laches defense.

Finally, I note that Tempest was convicted of murder in the second degree and sentenced to eighty-five years in prison. After rejecting the state's defense of laches, the hearing justice presided over a postconviction-relief hearing that spanned twenty-four days, and he then determined, in a thoughtful and conscientious decision, that Tempest's due process rights were violated and that Tempest was denied a fair trial. A fundamental principle animating our criminal justice system was articulated by Sir William Blackstone in his seminal work, *Commentaries on the Laws of England:* "[I]t is better that ten guilty persons escape, than that one innocent suffer." 4 William Blackstone, Commentaries *352. In the circumstances of this case, I believe it to be in the interest of justice that the issues raised on appeal, which were fully vetted in the Superior Court, be decided on their merits.

### III

### Brady Claim

The state argues that, even if the laches defense does not bar Tempest's application for postconviction relief, his *Brady* claim relating to the maroon car should fail because any evidence, if indeed withheld from the defense, was not material pursuant to *Brady* and was discoverable with the exercise of due diligence. Specifically, the state argues that Tempest could have discovered that the McManns would not have lent the maroon vehicle to Monteiro prior to trial, and that, accordingly, this evidence was not *Brady* material. The state also argues that while Kevin McMann's testimony, as credited by the hearing justice, contradicted Richards' testimony that Monteiro borrowed the ma-

roon car in 1982, that did not mean that Richards did not see Tempest standing beside a maroon car (although not necessarily John McMann's maroon car). The state further suggests that, because there was already trial testimony from the DMV employee that Monteiro did not own any vehicle at the time of the murder, thus contradicting Richards' account of seeing Tempest next to "Monteiro's" maroon car on the day of the murder, this new evidence—that the McManns would not have lent the car to Monteiro in 1982—does not create a probability that the result of Tempest's trial would have been different had this statement been available to the defense.

The state violates a defendant's due process rights under *Brady* when it suppresses evidence favorable to the accused that is "material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. "[W]here a nondisclosure is *not* deliberate, [an] applicant [is] required to make a showing of materiality * * *." *DeCiantis,* 24 A.3d at 571. Evidence is "material" for purposes of *Brady* when a "reasonable probability" exists that "the result of the proceeding would have been different" if the suppressed evidence had been disclosed. *Lerner,* 542 A.2d at 1092 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Reasonable probability does not require that "the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Smith v. Cain,* —— U.S. ——, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012) (quoting *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). "Impeachment evidence * * * as well as exculpatory evidence, falls within the *Brady* rule." *Bagley,* 473 U.S. at 676,

105 S.Ct. 3375. *Brady* has also been expanded to impose a duty on the prosecutor to learn of any favorable evidence "known to the others acting on the government's behalf," *D'Alessio v. State*, 101 A.3d 1270, 1278 (R.I.2014) (quoting *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555), "*including the police.*" *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (emphasis added).

This Court has previously stated that we "will not disturb a trial justice's factual findings made on an application for post[ ]conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings." *Chapdelaine v. State*, 32 A.3d 937, 941 (R.I.2011) (quoting *Gordon v. State*, 18 A.3d 467, 473 (R.I.2011)). We will, nonetheless, "review *de novo* any post[ ]conviction[-]relief decision involving questions of fact or mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights." *Id.* (quoting *Gordon*, 18 A.3d at 473).

After hearing extensive testimony, the hearing justice found that "John McMann told the [Woonsocket Police Department] he did not loan his maroon car to * * * Monteiro" when the Tempest criminal trial was ongoing. The hearing justice found as fact that Kevin McMann "also informed law enforcement that he never loaned [the maroon car] out." The hearing justice found that "there [wa]s no indication that [the former prosecutor] ever learned of these statements, and, as such, this evidence was never disclosed to defense counsel." The hearing justice held that "although any nondisclosure by the [s]tate appear[ed] to be wholly inadvertent, it still failed to fulfill its duty to disclose." The hearing justice noted that, here—where the state's case against Tempest "was based entirely on circumstantial evidence," and where "[t]he statement by * * * LaDue that she saw a maroon car upon returning home the afternoon of the murder, and the corresponding testimony from * * * Richards that she saw * * * Tempest standing by a maroon car driven by * * * Monteiro that same afternoon, constitute[d] the *only* piece of evidence linking * * * Tempest to the crime scene at the appropriate time"—any "evidence tending to suggest that * * * Tempest was not in a maroon car that day [was] enough to 'undermine[ ] confidence in the outcome of the trial.'"

The state's argument that Kevin McMann's statement was not "suppressed" under *Brady* because Tempest, through the exercise of reasonable diligence,[12] could readily have learned whether Kevin McMann loaned the maroon vehicle to

---

**12.** In *State v. Clark*, 754 A.2d 73, 78 n. 1 (R.I.2000), this Court

"issue[d] the caveat that to qualify for post-conviction relief in respect to [a *Brady*] issue, it [would] be necessary for [the] defendant to establish that evidence to be presented is newly discovered and was not known, or, in the exercise of reasonable diligence, would not have been known in time to raise the issue fully at trial or in a motion for new trial * * *."

However, the United States Supreme Court, four years later, held in *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), that its "decisions len[t] no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material * * *." *Id.* at 695, 124 S.Ct. 1256. "A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 696, 124 S.Ct. 1256. Since *Clark*, this Court has never articulated a "due diligence" requirement on the part of a defendant who claims a *Brady* violation. Following *Banks*, several courts have expressly declined to adopt a due diligence requirement. *See Amado v. Gonzalez*, 758 F.3d 1119, 1137 (9th Cir.2014); *United States v. Tavera*, 719 F.3d 705, 712 (6th Cir.2013); *People v. Chenault*, 495 Mich. 142, 845 N.W.2d 731, 737 (2014).

Monteiro, was not raised before the Superior Court, nor was it raised before this Court in the state's petition for writ of certiorari. Accordingly, it has been waived. *See Town of Burrillville v. Rhode Island State Labor Relations Board*, 921 A.2d 113, 119 (R.I.2007) ("[W]e will not consider any issue that is not included in a petitioner's initial petition for issuance of a writ of certiorari."); *see also State v. Bido*, 941 A.2d 822, 828–29 (R.I.2008) ("It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.").

Moreover, Tempest testified at the postconviction-relief hearing that he was unaware of Monteiro borrowing the maroon car before Monteiro purchased it in 1983— not that he knew for a fact that Monteiro never borrowed the car. He also testified that, prior to being represented by McDermott Will & Emery, he did not have any knowledge that anybody from the McMann family had gone to the police. William Dimitri, who sat second-chair in Tempest's criminal trial, also testified that the state never disclosed to him that Kevin McMann had denied lending the car to Monteiro. Even with John McMann's handwritten letter in Tempest's file stating that he would not have been without a car prior to selling, there is no indication from the evidence presented at the postconviction-relief hearing that Tempest *also* knew that the McManns would not have lent the maroon car to Monteiro in 1992, as the state suggests.

This evidence, if properly disclosed to the defense, would have directly contradicted Richards' trial testimony that Monteiro "used to borrow" the maroon car. The state presented no physical or eyewitness evidence against Tempest at trial. As the trial justice who presided over the criminal case noted, "there[ ] [was] no doubt in the [c]ourt's mind that the connection [of] [Tempest] to the crime was all furnished by *his own words* * * * [a]ccording to the [s]tate's case."[13] (Emphasis added.) In the state's closing argument at the criminal trial, the state acknowledged that it had "brought out many of the failures or the deficiencies of the crime scene to explain to [the jury] why there [was] not [*sic*] physical evidence connecting [Tempest] to the crime." The state in its closing also highlighted the importance of the maroon car, by noting that:

"[Richards] ha[d] * * * told [the jury] about the maroon car [Tempest] * * * was getting out of on February 19th outside of her place at about quarter to five in the afternoon. The maroon car should [have] sound[ed] familiar to [the jury] because the maroon car * * * that [LaDue] [had] described in the driveway outside 409 Providence Street. And once again, she has told you that that maroon car belonged to someone named Kevin McMann."

Because, as the hearing justice noted, the maroon car was the only physical evidence linking Tempest to the murder scene during the time of the murder, any evidence tending to negate the credibility of the witness who testified that she observed Tempest in the maroon car that

---

13. Four witnesses testified at the criminal trial that Tempest had confessed to them his involvement in the murder: Donna Carrier and John Guarino, whose trial credibility was significantly compromised; Ronald Vaz, whose trial testimony the hearing justice characterized as "mortared with a hastily-made blend of inconsistencies and half-truths" and whose credibility was "thoroughly demolish[ed]"; and Loretta Rivard, a witness who testified that Tempest confessed to her during an evening of drinking beer and snorting cocaine. Consequently, it may be a low threshold to undermine confidence in the outcome of the trial.

day tends to undermine confidence in the outcome of the trial. I see no clear error in the hearing justice's findings of fact as they relate to the maroon car, and I agree that the evidence of the maroon car was material. Accordingly, I would affirm the order vacating Tempest's conviction, albeit on different grounds than the majority.

Justice GOLDBERG, dissenting.

The 1982 brutal murder of Doreen Picard (Picard)—not unlike the attempted murder of Martha "Sunny" von Bulow, *see State v. von Bulow,* 475 A.2d 995 (R.I. 1984)—ranks as one of the most infamous crimes committed in this state during the last century. The fact that no arrest was made for several years was a festering sore in the community, compounded by a cover-up by sworn police officers. The majority affirms the hearing justice's grant of postconviction relief—which vacates a twenty-four-year-old conviction for this murder—solely on the basis of the prosecution's deliberate nondisclosure of two statements (the Carrier statements) of Donna Carrier (Carrier), one of four trial witnesses to whom Raymond Tempest Jr. (Tempest) confessed. In his seventy-eight-page decision, the hearing justice devoted a grand total of two-and-a-half pages to this issue, including the factual background, the governing legal standard, and his analysis relating to this evidence. This issue demanded more than the cursory treatment it received in the Superior Court and by the justices of this Court on appeal, such that I can only conclude that this decision is a manifest injustice.

After conducting a thorough examination of the relevant factual background and analysis of the issue within this Court's deliberate-nondisclosure framework, I am convinced that the hearing justice clearly erred in finding that the nondisclosure of the Carrier statements was a deliberate nondisclosure as that concept is defined under our law. Moreover, I am of the opinion that the majority, in reaching a contrary conclusion, improperly supplements the inadequate factual findings of the hearing justice with findings of its own in order to reach a result that is not supported by our jurisprudence and is a marked departure from well-settled law. It is not the business of this Court to make factual findings in a nonjury case. Therefore, I respectfully dissent. I would vacate the hearing justice's grant of postconviction relief because (1) the nondisclosure of the Carrier statements was not a deliberate nondisclosure and the Carrier statements are not material; (2) Tempest's *Brady* claim [1] with respect to the McMann evidence [2] not only is barred by the doctrine of laches, but it also is without merit under *Brady;* and (3) Tempest's witness-coaching claim is barred by *res judicata,* and, additionally, the hearing justice's inventive standard for judging this claim is erroneous and has no basis under this nation's constitutional framework. I also take issue with the majority's refusal to address this witness-coaching issue because this case is being remanded for a new trial, and, in order to provide guidance to the trial justice upon remand, this issue should be resolved by this Court.

# I

## The Carrier Statements

In my opinion, the hearing justice clearly erred in concluding that the state's non-

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. I use the term "McMann evidence" to refer to the evidence that John and Kevin McMann allegedly told officers of the Woonsocket Police Department that Robert Monteiro did not borrow the McManns' maroon car before purchasing it from John in 1983.

disclosure of the Carrier statements qualified as "deliberate" under the deliberate-nondisclosure doctrine of *State v. Wyche,* 518 A.2d 907, 910 (R.I.1986).[3] Rather than acknowledging the fatal flaws in the hearing justice's decision, the majority compounds them by making its own factual findings—which are also erroneous—in an effort to bolster the decision. Because the hearing justice's finding of deliberateness is clearly erroneous, Tempest is entitled to postconviction relief as a result of the nondisclosure of the Carrier statements if, and only if, this evidence is material under *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and its progeny. And, as explained below, the Carrier statements amount to mere cumulative impeachment evidence and do not constitute material evidence under *Bagley.*

## A. Background

A thorough analysis of the prosecution's nondisclosure of the Carrier statements must include a full explication of the relevant facts. Prior to February 19, 1982, the date on which Picard was brutally beaten to death in the basement of her apartment building at 409 Providence Street in Woonsocket, Susan Laferte (Laferte), who also lived at 409 Providence Street, agreed to mate her pit-bull terrier with Tempest's pit bull. The evidence disclosed that, hours before the murder, Tempest had been at 409 Providence Street to select a puppy from the resulting litter, which Laferte had promised him in exchange for the use of his pit bull. Tempest intended to give the puppy to John Allard (Allard). On that fateful afternoon, Sherri Richards (Richards)[4] saw Tempest leave her apartment between 1:20 and 1:30 p.m. with Allard to pick out the puppy, return alone between 2 and 2:30 p.m., depart once more soon thereafter, and return once again between 4:30 and 4:45 p.m. When Tempest returned the second time, Richards noticed that he had changed his boots and was sporting a new bite mark or scratch on his wrist. Meanwhile, at 409 Providence Street, the severely beaten bodies of Picard and Laferte were discovered in the basement at approximately 3:30 p.m. Picard was pronounced dead at the scene at 4:30 p.m. Laferte was grievously injured. There were no eyewitnesses to this crime.[5]

For several years, the homicide remained unsolved, which was unsurprising in light of the ongoing cover-up that was perpetrated by members of the Woonsocket Police Department, including Tempest's brother, Det. Gordon Tempest (Gordon). In February 1987, Carrier gave a statement to police. In this statement, Carrier stated that, at the time of the murder in 1982, she and her then-boyfriend, John

**3.** Although this Court first adopted the deliberate-nondisclosure standard in *In re Ouimette,* 115 R.I. 169, 177, 342 A.2d 250, 254 (1975), I refer to it as the *Wyche* doctrine because *State v. Wyche,* 518 A.2d 907, 910 (R.I.1986), was the first of only two occasions that this Court employed the doctrine in a *Brady* case to vacate a conviction.

**4.** Both the trial transcript and our opinion affirming Tempest's conviction, *State v. Tempest,* 651 A.2d 1198, 1204 (R.I.1995), list Richards' first name as "Sherri." However, her November 1991 police statement and her death certificate list it as "Sheri."

**5.** Laferte's daughter Nicole—who was three years old on the day of the murder—remembered a man arriving at her house that day; the man either proceeded into the basement at a time when Laferte was also in the basement or Laferte and the man went to the basement together, and Nicole heard her mother yell and a dog bark, followed by a "boom boom" noise and "a[]lot of banging in the cell[a]r." Nicole was unable to identify this man, however. Nicole did not testify at Tempest's trial.

Guarino (Guarino), lived on the third floor at 448 Winter Street in Woonsocket and that Tempest and his family lived at the same address on the floor below. As it turns out, however, Tempest and his family did not move to that address until 1983. But Carrier explained in her February 1987 statement that, in March 1982, Tempest confessed to the murder in her and Guarino's presence at their apartment located at 448 Winter Street. According to Carrier, Guarino

> "asked [Tempest] if he thought the [p]olice kn[e]w and [Tempest] said[,] '[N]o[,] my father would take care of it.' * * * He said that [t]hey can't do anything because there is no evidence. [Guarino] then asked if [Tempest] used his hands and [Tempest] said no, and something about a hammer or pipe and said that they would never find anything, there are no fingerprints and everything has been taken care of. * * * [Tempest] continued[,] saying[,] 'My father is * * * an important man, High Sheriff of Providence[.] It cost a[ ]lot of money for my father to make sure my name didn't get brought up in this. If my brother Gordie knew he would turn me in.' "

Tempest was in possession of Carrier's February 1987 statement at the time of his trial.

Carrier testified before the grand jury on November 30, 1990. Carrier first reviewed her February 1987 statement before the grand jurors. She also testified that, although she knew Tempest before the two became neighbors, she did not know Tempest's then-wife, Jane Tempest (Jane), until after the Tempests moved into the Winter Street building. Additionally, she testified, in detail, about certain observations she made of Tempest on the day of the murder:

> "A: Johnny Allard was with [Tempest] that afternoon that they came home,

they were supposed to pick up a pit[ ]bull puppy from um, either Doreen Picard or Sue La[f]erte, one or the other, because they had had a pit[ ]bull dog that mated with their dog and they were going to get the pick of the litter. Well this was the afternoon supposedly that he went over to pick the dog up and the puppy up from these people, that was his excuse for going over there and the puppy wasn't shown up [sic] until maybe about a week after the murder.

"Q: Okay, but what, how do you know that, that * * *

"A: Because they were, um, talking about it earlier in the day that they were going to pick up their puppy.

"Q: Were you, did you hear them talking about it earlier?

"A: In the kitchen, they were in the kitchen in Jane's apartment and [Tempest]'s apartment.

"Q: Okay, and you were there?

"A: Yes.

"Q: That's the day of the murder?

"A: That was the day of the murder.

"Q: And this is before they went to pick up the pit[ ]bull?

"A: Before they went to pick up the pit[ ]bull.

"Q: Okay. Did they say anything else about that?

"A: No, just that they had the pick of the litter of the puppies and that they were going.

"* * *

"A: Because the afternoon of the murder, um, I had come out into the hallway * * *. I had, I was looking out the window and I was, my son was outside playing in the backyard and um, John [Allard] and [Tempest] were together and [Tempest]'s truck and they pulled up, the both of them had

paint hat, painter's hats on and um, [Tempest] had a habit of wearing his painter's hat backwards. * * * [T]hey got out of the car and it was like 4:00 in the afternoon, 4:30, 5:00, somewhere around in that area and he had gotten out of the car and came upstairs and I know I didn't think that the clothes were the same as what he went out with, [be]cause he went out wore [sic] jeans all the time, and [T]-shirts and when he came back, he had on [a] flannel shirt and a pair of jeans and sneakers and with a painter's [redacted]."

Tempest was in possession of Carrier's grand-jury testimony at the time of his trial.

Carrier also testified at Tempest's bail hearing in June 1991. Carrier's testimony was consistent with the information she relayed in her February 1987 statement. At that hearing, Carrier was cross-examined by one of Tempest's attorneys, William C. Dimitri (co-counsel).[6]

In August 1991, Carrier gave another statement to police. Although this statement was generally consistent with Carrier's February 1987 statement regarding the specifics of Tempest's confession to her and Guarino in Carrier's apartment, it diverged somewhat from the earlier statement with respect to Tempest's explanation about the cover-up efforts of his father and brother. In the August 1991 statement, Carrier stated:

"[Tempest] used to say [that] nothing would happen to him because of who his father and brother were. At the beginning of the conversation, he said, '[M]y

father and brother don't know anything about this.' Then in the course of the conversation, [Guarino] was asking questions, 'What happens if you get caught?' [Tempest] said, 'I won't get caught[;] my father *and brother* won't let me get caught.' *'The weapon's been all taken care of,'* he said." (Emphases added.)

Thus, unlike Carrier's February 1987 statement—which disclosed that Tempest stated that "[i]f my brother Gordie knew he would turn me in"—Carrier's August 1991 disclosure implicated Gordon by stating that he would not let Tempest get caught and that the weapon had been taken care of. This statement clearly implied that Gordon was involved in cover-up activity. Like Carrier's February 1987 statement, Tempest was in possession of this statement at the time of his trial.

On March 10, 1992, the lead prosecutor in Tempest's criminal case (the former prosecutor), a well-respected member of the bar, learned of the Carrier statements.[7] The Carrier statements, which are reflected in the former prosecutor's handwritten notes from that date, conveyed two discrete pieces of information. First, the former prosecutor's handwritten notes from this date reveal that, according to Carrier, Tempest's children were excited on the day of the murder because they were getting a puppy. Second, the former prosecutor's notes also reflect that Carrier informed him that Gordon put the pipe—the murder weapon—in the closet. The notes contain the following notation:

"More new [i]nfo re: GT [Gordon Tempest] putting pipe in closet + dog for

---

6. At trial, Tempest was represented by the late William A. Dimitri Jr. and his son, William C. Dimitri. To distinguish between the similarly named members of the defense team, I shall refer to the elder Dimitri as "defense counsel" and to his son as "co-counsel."

7. At the postconviction-relief hearing, the former prosecutor could not remember whether he received this information directly from Carrier or through Sgt. Ronald Pennington (Pennington).

the kids—too late—don't volunteer new info—will cause big problems[.]"

The former prosecutor did not disclose the Carrier statements to the defense. The reasons for his decision not to do so lie at the heart of this case.

The fact that Carrier was mistaken about the date that the Tempests became her neighbors at 448 Winter Street is clear. Precisely when the former prosecutor learned about this discrepancy is not as clear, but it cannot be denied that defense counsel was aware of Carrier's mistake before trial and that the former prosecutor nonetheless called her as a witness knowing full well that she would be severely impeached by the defense. Long before Carrier gave her police statement in 1987, the police were in possession of statements that Tempest gave shortly after the murder in 1982; in these statements, Tempest indicated that he lived at 42 Phoebe Street in Woonsocket. Additionally, the former prosecutor was aware in late December 1991 that Pamela Miclette told police earlier that month that she babysat Tempest's children on the day of the murder and that the Tempests were living on Phoebe Street at that time. However, the former prosecutor testified at the postconviction-relief (PCR) hearing that, when Carrier made these disclosures, he was not certain whether he knew that she was mistaken about when the Tempests became her neighbors. In any event, it is evident that, by the start of trial on March 27, 1992—seventeen days after the former prosecutor received the Carrier statements—he knew that Carrier was mistaken in her earlier assertion that she and the Tempests lived in the same building on the day of the murder. The defense, of course, was well aware of Carrier's mistake before trial.

At trial, Carrier testified as a witness for the prosecution. Her testimony on direct examination was brief, spanning only thirteen pages of transcript. She recounted the details of Tempest's confession to her and Guarino that occurred in her apartment at 448 Winter Street. Consistent with the details she provided in her February 1987 statement, Carrier gave the following testimony about Tempest's explanation of cover-up efforts during his confession:

"[Guarino] asked [Tempest] if his father and brother knew about this. He said his brother didn't know but his father did. His father had paid off a large sum of money to make sure that [Tempest]'s name was never mentioned about this. The murder weapon would never be found[;] it had been wiped clean of fingerprints and gotten rid of."

For the first time, however, Carrier indicated that Tempest's confession at 448 Winter Street occurred in 1983—not March 1982 as she had previously maintained. When asked why she recalled that the confession occurred in 1983, Carrier responded:

"My ex-landlord, his mother is a resident at the facility that I work at. When I saw Mr. Leroux, all of the neighbors had started coming back to me and I realized that after one family moved out[,] another family moved in. And when this other family moved out[, Tempest] and Jane moved in and that was in 1983."

During her direct examination, Carrier did not mention her claimed day-of-the-murder observations that she related to the grand jury.

To no one's surprise, Carrier was subjected to a scathing cross-examination at the hands of defense counsel. Defense counsel probed in depth whether Carrier had truly coincidentally realized her mistake about the date on which she heard Tempest confess or whether her memory

had been corrected by the police or the prosecution. Even more strenuously, defense counsel sought to establish that, because she and Tempest were not neighbors on the day of the murder, Carrier could not have made the day-of-the-murder observations that she recounted to the grand jury. Defense counsel's cross-examination on this point was so effective that even the trial justice[8] pressed Carrier to admit that, contrary to what she told the grand jury, she never observed those details:

"Q Where did you get these observations that you made [on] the day of the murder? By reading the Woonsocket Call, is that where you got it?

"A No.

"Q Because you would agree with me, you certainly didn't see it, isn't that a fact? You could not have seen it, isn't that a fact?

"A If it was 1982 or 1983, no.

"Q You could not have seen it the day of the murder, am I correct about that?

"A You are correct.

"Q So you were mistaken?

"A With the dates, yes.

"Q You were mistaken as to what you saw; isn't that a fact?

"[PROSECUTOR]: Objection.

"THE COURT: Overruled. She keeps insisting she saw it. She says the date is wrong. Did you see it or didn't you?

"THE WITNESS: No.

"THE COURT: You didn't see it?

"THE WITNESS: No."

Additionally, defense counsel confirmed with Carrier that she had told the police that Tempest indicated that his brother

Gordon did not know of his involvement. However, although defense counsel marked Carrier's August 1991 statement—which referenced Gordon's knowledge of Tempest's culpability and suggested his involvement in a cover-up—as a defense exhibit for identification, he did not confront Carrier with that inconsistency. Indeed, the defense steered well clear of any reference to Gordon's involvement in this cover-up.

At Tempest's PCR hearing, when the former prosecutor was confronted with his handwritten notation from March 10, 1992, he explained that it reflected his thoughts that it was too late to supplement discovery at that juncture and that a supplementary response to use what he considered to be incriminating evidence would "cause [a] big problem[ ]" in the form of continuances and headaches. He did not believe that the evidence itself would have an adverse impact on the state's case and said so more than once:

"Q And your response was it was 'too late,' you said, 'don't volunteer new information,' correct?

"A It was too late in a discovery sense, yeah. We were not going to supplement discovery regarding that point because we are on the eve of trial.

"Q And you wrote down 'will cause big problems'?

"A Well, cause a big problem supplementing at this point and probably end up having to continue the case.

"Q And you thought it would lead to a continuance and to headaches?

"A Headaches.

" * * *

"Q You think, your thought at the time was if you produced new information

---

8. To distinguish between the two, I refer to the Superior Court justice who presided over Tempest's criminal trial as "the trial justice," and the Superior Court justice who presided over Tempest's PCR hearing as "the hearing justice."

to [the] defense it might lead to a continuance, correct?

"A Yeah. *And I didn't see it as exculpatory.* I wasn't going to offer that testimony in our direct case and I didn't do it.

" \* \* \*

"Q That is part of the new information that you thought would cause big problems, correct?

"A Well, *supplementing discovery* at that point I thought would cause a big problem, *not the information itself* \* \* \* but the act of doing it." (Emphases added.)

Clearly, at the PCR hearing, the former prosecutor viewed the Carrier statements as inculpatory—which, of course, they were—and not exculpatory. It was only after Tempest's PCR counsel suggested to the former prosecutor that the evidence could be used for impeachment purposes that he understood its potential as favorable defense evidence.

Co-counsel testified at Tempest's PCR hearing that, had the Carrier statements been disclosed to the defense, the evidence would have been used in cross-examination. Critically, however, the defense had Carrier's August 1991 statement before trial, in which she explained that Tempest stated: " 'I won't get caught[;] my father and brother won't let me get caught.' 'The weapon's been all taken care of' \* \* \*." Although this statement clearly contradicted the portion of her February 1987 statement in which she stated that Tempest told her and Guarino that "[i]f my brother Gordie knew he would turn me in," and although defense counsel marked Carrier's August 1991 statement as a defense exhibit for identification, defense counsel did not impeach Carrier on the inconsistencies between her February 1987 and August 1991 statements.

The hearing justice granted Tempest postconviction relief on the basis of the former prosecutor's nondisclosure of the Carrier statements. Unfortunately, this is the only aspect of the hearing justice's decision that the majority is willing to address, a situation that will lead to future litigation concerning the witness-coaching claim, at least in the Superior Court and, potentially, in this Court.

Of the seventy-eight pages that comprised his decision, the following is the entirety of the two-and-a-half pages that the hearing justice devoted to the treatment of the background facts, controlling legal principles, and analysis of the issue:

"Turning to Mr. Tempest's second claim, the [c]ourt examines the alleged nondisclosure of statements made by Ms. Carrier to law enforcement shortly before trial. Ms. Carrier testified at trial that Mr. Tempest admitted to carrying out the murder, confessing to her that Doreen Picard 'came down the stairs at the wrong time [and] saw him hitting [Ms. Laferte]. He couldn't let her get away and he had to do her, too.' (Trial Tr. 1112:12–15, Apr. 6, 1992.) Part of this confession included statements by Mr. Tempest to the effect that his brother, Gordon Tempest, could not find out about his involvement. While the credibility of her story was brought into question upon cross-examination, her testimony regarding Mr. Tempest's statements that his brother was unaware of his involvement in the brutal slaying went undisputed. However, a note from the prosecutor's file reveals that shortly before [the former prosecutor] delivered his opening statement, Ms. Carrier had told the [s]tate that 'Gordon Tempest had put the pipe in the closet' in an effort to conceal the murder weapon. (Tr. 35:13–14, Mar. 17, 2015 (Testimony of [the former prosecutor] ).) This was the first time in the five years

she had spoken with police that she mentioned Gordon Tempest's involvement in a cover-up.[9] *Id.* at 46:15–17. She also made a second disclosure that Mr. Tempest's children were excited on the morning of the murder because they were going to get a puppy. Not only was this revelation inconsistent with the undisputed evidence that the dog to be picked up by Mr. Tempest from Ms. Laferte was intended for John Allard, not the Tempest family, her awareness of the children's excitement would have also been impossible—Ms. Carrier did not live near Mr. Tempest on the day of the murder as she claimed.[31][10] Such discrepancies reflect a suspicious malleability in her recollection undercutting the credibility of her testimony. Nevertheless, these statements related to motive and the concealment of evidence were not disclosed to defense counsel. Instead, [the former prosecutor] directed Ms. Carrier not to include such accounts before the jury. After learning these new details to her latest statement, he wrote in his notes, 'too late, don't volunteer new info, will cause big problems.' *Id.* at 36:20–21.

"With respect to disclosure of exculpatory or impeaching evidence, the Rhode Island constitution 'provides even greater protection to criminal defendants than' its federal counterpart. [*State v.*] *Chalk,* 816 A.2d [413,] 419 [ (R.I.2002) ]. To this effect, our Supreme Court has 'adopt[ed] a sliding-scale analysis based on the blameworthiness of the prosecution in failing to disclose the evidence.'

*State v. Brisson,* 619 A.2d 1099, 1102 (R.I.1993). In expanding a defendant's constitutional rights beyond the requirements set forth by the United States Supreme Court, our jurisprudence provides that 'the reason for the nondisclosure can be dispositive concerning the likelihood of a new trial.' *Id.* In finding a violation, '[t]he easy cases * * * are where the prosecutor's suppression is deliberate, by which we include * * * a considered decision to suppress[.]' *Lerner v. Moran,* 542 A.2d 1089, 1092 (R.I. 1988) (quoting *United States v. Keogh,* 391 F.2d 138, 146–47 (2d Cir.1968)). Our Supreme Court has noted that '[w]hen the failure to disclose is deliberate, this court will not concern itself with the degree of harm caused to the defendant by the prosecution's misconduct; we shall simply grant the defendant a new trial.' *Wyche,* 518 A.2d at 910. In such cases, the materiality of the evidence to the case is of no moment; rather, the purposeful act of nondisclosure necessitates 'automatic reversal.' *Lerner,* 542 A.2d at 1092.

"Here, the willful nature of such suppression is readily apparent. While [the former prosecutor] noted at [the] hearing that he chose not to make such disclosures because he felt 'it would lead to a continuance and to headaches[,]' such concerns did not relieve him of his prosecutorial duty. (Tr. 44:11–12, Mar. 17, 2015). Constitutional rights cannot be tossed aside whenever they present the smallest inconvenience. *Okla. Natu-*

---

**9.** As will be demonstrated below, this statement by the hearing justice was clearly erroneous.

**10.** Footnote 31 of the hearing justice's decision read:

"In this statement, Ms. Carrier also mentioned that she saw Mr. Tempest on the day of the murder. However, this discrepancy was disclosed before trial. One focus of her cross-examination was that Ms. Carrier had mixed up when Mr. Tempest lived in the same apartment building as her; she had erroneously believed they were in the same building at the time of the murder when, in actuality, he moved in around a year later."

*ral Gas Co. v. Russell*, 261 U.S. 290, 293, 43 S.Ct. 353, 67 L.Ed. 659 (1923) (stating that 'convenience must give way to constitutional rights'); *see also O'Clair v. United States*, 470 F.2d 1199, 1204 (1st Cir.1972) (holding that 'administrative convenience cannot justify infringement of constitutional rights'); *State v. Slockbower* [79 N.J. 1], 397 A.2d 1050, 1055 (N.J.1979) (stating that 'constitutional rights * * * cannot be subordinated to mere considerations of convenience'). Furthermore, the protean nature of Ms. Carrier's testimony was not only a 'big problem[ ]' in the eyes of [the former prosecutor], it was necessarily harmful to the [s]tate's case.[32][11] (Tr. 44:8, Mar. 17, 2015.) By deciding not to disclose the newly arisen variations in her story, [the former prosecutor] evidently sought to protect Ms. Carrier from additional impeachment. Such a 'considered decision to suppress' automatically necessitates relief. *DeCiantis [v. State]*, 24 A.3d [557,] 570 [ (R.I.2011) ]."

## B. Deliberate–Nondisclosure Doctrine

A factual finding of a hearing justice "is clearly erroneous when, although there is evidence to support it, the reviewing court[,] on the basis of the entire evidence[,] is left with the definite and firm conviction that a mistake has been committed." *State v. Bido*, 941 A.2d 822, 835–36 (R.I.2008) (quoting *State v. Perez*, 882 A.2d 574, 588 (R.I.2005)). In this case, after reviewing the entirety of the record—including the former prosecutor's testimony at the PCR hearing and his handwritten notes of March 10, 1992—I am left with the definite and firm conviction that the hearing justice clearly erred in concluding that the nondisclosure of the Carrier state-

ments was deliberate under the *Wyche* doctrine.

The law surrounding this issue is neither complex nor difficult to understand. Under *Wyche*, a deliberate nondisclosure is not simply one that is purposeful or intentional, as the hearing justice erroneously concluded. Instead, to qualify as a deliberate nondisclosure, one of two specific tests must be met. First, "[t]he prosecution acts deliberately when it makes 'a considered decision to suppress * * * *for the [very] purpose of obstructing*' * * *." *Wyche*, 518 A.2d at 910 (quoting *Keogh*, 391 F.2d at 146–47) (emphasis added). Alternatively, if the nondisclosure is not found to be for the very purpose of obstructing the defense, a deliberate nondisclosure can still be established if the prosecution "fail[ed] 'to disclose evidence whose high value to the defense could not have escaped * * * [its] attention.' " *Id.* (quoting *Keogh*, 391 F.2d at 147). Neither test for deliberateness is met in this case.

### 1. Considered Decision to Suppress *for the Very Purpose of Obstructing*

Notwithstanding the majority's *ipse dixit* to the contrary, the hearing justice did *not* correctly set forth the test for deliberateness in this context. The closest the hearing justice came to touching on the test for deliberateness is the following sentence: "In finding a violation, '[t]he easy cases * * * are where the prosecutor's suppression is deliberate, by which we include * * * a considered decision to suppress[.]' " (Quoting *Lerner*, 542 A.2d at 1092.) This selective snippet from *Lerner* does not accurately set forth the test for deliberateness. It is not enough that the nondisclosure constitutes "a considered decision to suppress." Instead, to constitute

11. Footnote 32 of the hearing justice's decision reads: *"See Sanborn v. Parker*, 629 F.3d 554, 572 (6th Cir.2010) ('Having heard of [witness'] constantly shifting stories, * * * a rational jury would surely have [ ] seriously doubted [his] credibility[.]')."

a deliberate nondisclosure under this prong of the *Wyche* test for deliberateness, the considered decision to suppress must be made *"for the [very] purpose of obstructing"*—that is, to impede the defendant's case. *Wyche*, 518 A.2d at 910 (quoting *Keogh*, 391 F.2d at 146–47) (emphasis added).[12] This is our law, and it is strictly applied for a very good reason: A considered decision to suppress for the very purpose of obstructing leads to the conviction being vacated. This severe sanction may be imposed only when *all* components of one of the two tests for deliberateness are satisfied.

The hearing justice's clearly erroneous determination that the former prosecutor's nondisclosure of the Carrier statements rose to the level of a deliberate nondisclosure flowed from his failure to set forth the accurate test for deliberateness under the *Wyche* doctrine. A close examination of the hearing justice's analysis of this issue—which consisted of a single paragraph—readily reveals his error. The hearing justice began by noting that, "[h]ere, the willful nature of such suppression is readily apparent." But, as is plainly obvious from the *Wyche* standard of deliberateness, willfulness is not enough; not every intentional failure to disclose qualifies as a deliberate nondisclosure under *Wyche*. Instead, there must be evidence that the nondisclosure was "taken for the *very purpose* of obstructing" the defense. *Lerner*, 542 A.2d at 1092 (quot-

ing *Keogh*, 391 F.2d at 146–47) (emphasis added). The hearing justice next noted one aspect of the former prosecutor's testimony at the PCR hearing regarding his failure to disclose the Carrier statements and emphasized that concerns about disclosure leading to a continuance "did not relieve [the former prosecutor] of his prosecutorial duty." I wholeheartedly agree with this sentiment, but it does not answer the paramount question of whether the former prosecutor's nondisclosure was deliberate under *Wyche*.

The hearing justice next cited three opinions—none of which involved a claimed *Brady* violation and one of which was not even a criminal case—for the uncontroversial proposition that "[c]onstitutional rights cannot be tossed aside whenever they present the smallest inconvenience"—a proposition that is utterly irrelevant to the question of whether the former prosecutor made "a considered decision to suppress * * * for the [very] purpose of obstructing" or "fail[ed] 'to disclose evidence whose high value to the defense could not have escaped * * * [his] attention.'" *Wyche*, 518 A.2d at 910 (quoting *Keogh*, 391 F.2d at 146–47).[13] The hearing justice then noted that "the protean nature of Ms. Carrier's testimony * * * was necessarily harmful to the [s]tate's case." Although this may or may not be accurate, it adds little to the relevant inquiry of whether the former prosecutor made a considered decision to suppress *for the very purpose of*

---

**12.** This necessary component of the considered-decision-to-suppress prong of the *Wyche* deliberateness standard is plainly evident from the entire passage of *Lerner v. Moran*, 542 A.2d 1089 (R.I.1988), but not from the selective quote from the Superior Court decision. *See id.* at 1092 ("The easy cases—at least they now seem so—are where the prosecutor's suppression is 'deliberate,' by which we include not merely a considered decision to suppress, *taken for the very purpose of obstructing*, but also a failure to disclose evi-

dence whose high value to the defense could not have escaped the prosecutor's attention." (quoting *United States v. Keogh*, 391 F.2d 138, 146–47 (2d Cir.1968) (emphasis added))).

**13.** Obviously, if the former prosecutor did not disclose the Carrier statements simply because they presented him with "the smallest inconvenience," this would not amount to a considered decision to suppress for the very purpose of obstructing.

*obstructing* or whether the evidence was of such a high value to the defense that it could not have escaped the former prosecutor's attention.

The next sentence in the hearing justice's decision is the closest thing I can find to a factual finding, and it unequivocally demonstrates that this case was wrongly decided. According to the hearing justice, "By deciding not to disclose the newly arisen *variations* in her story, [the former prosecutor] *evidently* sought to protect Ms. Carrier from *additional impeachment.*" (Emphases added.) Evidently? This sounds like speculation to me, a concern that is ignored by the majority. Additional impeachment? This aspect of the decision declares—perhaps unintentionally—that the value of this evidence rested on its cumulative impeachment value: that is, to show "variations in [Carrier's] story." Under our PCR statutory framework, "[t]he [Superior C]ourt [hearing justice] *shall make specific findings of fact* * * * relating to each issue presented." General Laws 1956 § 10–9.1–7 (emphasis added). In order to find that the nondisclosure was deliberate, the hearing justice was obligated by § 10–9.1–7 and the *Wyche* doctrine to make specific findings of fact that the former prosecutor made a considered decision to suppress the Carrier statements for the very purpose of obstructing or a separate finding that the undisclosed evidence was of such a high value to the defense that the former prosecutor could not have overlooked it. Rather than make affirmative, specific findings on one of those two points, the hearing justice merely stated that "[the former prosecutor] *evidently* sought to protect Ms. Carrier from *additional impeachment.*" (Emphases added.) In order to vacate a twenty-four-year-old murder conviction under *Wyche*, more was required. Notably, the majority does not even address this equivocal finding by

the hearing justice, and, by failing to confront this issue, the majority deviates from our well-settled jurisprudence.

In any event, the evidence does not support the hearing justice's finding that the former prosecutor's nondisclosure was "evidently" for the purpose of protecting Carrier from additional impeachment. At the PCR hearing, the former prosecutor clearly and consistently explained what he meant by his handwritten notation "too late—don't volunteer new info—will cause big problems": He believed that it was too late to supplement the state's discovery with respect to inculpatory proof it intended to present at trial and that any attempt to do so would lead to a continuance. The former prosecutor testified that "supplementing discovery at that point I thought would cause a big problem, not the information itself, but the * * * act of doing it." He explained that his note that it was "too late" was similarly in relation to supplementing discovery: "It was too late in a discovery sense, yeah. We were not going to supplement discovery regarding that point because we are on the eve of trial." A factfinder may reject this testimony but is not permitted to ignore it.

In his scant reference to the former prosecutor's testimony, the hearing justice misconceived this material evidence. He noted the former prosecutor's stated reasons for the note—which the hearing justice understood to be based on considerations of convenience (which, of course, would not rise to the level of a deliberate nondisclosure under *Wyche*)—but he deemed them to be irrelevant, concluding that the former prosecutor's "concerns did not relieve him of his prosecutorial duty." However, the former prosecutor's testimony constituted critical evidence bearing on the important question of whether he failed to disclose the evidence for the very purpose of obstructing. Notably, the

hearing justice made no credibility finding as to the former prosecutor's testimony. Instead, the trial justice sidestepped this testimony altogether, concluding that the former prosecutor "evidently sought" to protect Carrier from additional impeachment. In reaching this conclusion, the hearing justice overlooked and misconceived the former prosecutor's testimony at the PCR hearing, which was highly relevant and material to the deliberateness inquiry. This was clear error. *See Bido v. State*, 56 A.3d 104, 110 (R.I.2012) ("When reviewing the grant or denial of postconviction relief, the hearing justice's factual findings and credibility determinations will be upheld 'absent clear error or a determination that the hearing justice misconceived or overlooked material evidence.'" (quoting *Lynch v. State*, 13 A.3d 603, 605 (R.I.2011))).

Finally, the concluding sentence of the hearing justice's one-paragraph "analysis" of the issue of whether the nondisclosure was deliberate—"[s]uch a 'considered decision to suppress' automatically necessitates relief"—is simply wrong. This is not a rote exercise by the factfinder or by this Court; a finding of deliberate nondisclosure under *Wyche* has severe consequences and warrants careful analysis. A "considered decision to suppress" is not enough to constitute deliberate nondisclosure unless there is also a finding that the decision has been made for the very purpose of obstructing. Other than a finding that the former prosecutor "evidently" sought to protect the witness from additional (cumulative) impeachment, the hearing justice made no definitive finding of fact regarding the purpose of the nondisclosure and, to the extent that such a

finding was attempted, it was clearly erroneous. It is my opinion that the hearing justice left this Court with no choice but to vacate his decision on this point.

The majority disagrees and, in doing so, compounds the problem by making its own findings of fact and substituting its judgment for that of the hearing justice. According to the majority, "the former prosecutor's own words—'don't volunteer'—indicate a considered decision not to offer the new information to the defense." This passage is problematic for two reasons. First, the hearing justice never made this factual finding, and the General Assembly has authorized only lower-court justices—and not the justices of this Court—to make such findings in the PCR context. *See* § 10–9.1–7. Second, in making this factual finding, the majority commits the same legal error as the hearing justice. Even though the former prosecutor's "don't volunteer" notation may indicate a "considered decision" to suppress, a considered decision to suppress, as a matter of law, does not alone constitute deliberateness under *Wyche*. There must be an additional determination that the decision was made for the very purpose of obstructing the defense. The "don't volunteer" notation tells us nothing of the reason for the nondisclosure. The former prosecutor's reasons are set forth in the record in this case and were ignored by the hearing justice and the majority in making its own findings—an unwarranted exercise, I suggest—in such an infamous case. The former prosecutor's own testimony answers this question, and there is nothing to suggest that the nondisclosure was for the very purpose of obstructing.[14]

---

14. The majority asserts that I "make[my] own factual determination that the former prosecutor was only referring to the fact that the new statements could be cause for a continu-

ance." Even if this assertion were accurate—and it is not—the majority does not dispute that *it* makes a factual finding of its own with respect to the meaning of "the former prose-

## 2. High Value of the Evidence

The majority also sets forth another justification for affirming the hearing justice with respect to the nondisclosure of the Carrier statements and, in doing so, makes another forbidden finding of fact in a non-jury case: "[T]he 'high value' of Carrier's new statements to the defense could not have escaped the former prosecutor's attention." I part company with the majority on this point for two reasons, one procedural and the second substantive.

At the outset, it is readily apparent to me that the hearing justice made no factual finding that the Carrier statements were of such high value to the defense that they could not have escaped the former prosecutor's attention, nor did he make any factual findings to warrant this conclusion.[15] This is serious business; convictions should not be vacated unless these critical findings are actually made and are presented in a posture to be reviewable by this Court. Indeed, as explained above, the hearing justice did not even mention

this alternative prong of the *Wyche* deliberateness standard in his decision, and the majority has no business doing so *sua sponte*. Under our law, the deliberateness determination is a factual finding reserved for the hearing justice. *See State v. Briggs*, 886 A.2d 735, 759 (R.I.2005). Yet the majority takes it upon itself to find as fact that the Carrier statements meet *Wyche's* high-value prong. The deferential standard of review through which we examine a lower tribunal's factual findings does not, in my view, grant this Court the creative license to make its own findings on an issue that was not even mentioned by the hearing justice. Because the hearing justice in this case neglected to make factual findings with respect to (or to even allude to) *Wyche's* high-value prong of the deliberateness standard, this Court should not fill in the blanks on that prong.

Nonetheless, since the majority has elected to make its own factual determination regarding the high value of this evidence, I am compelled to state my reasons

cutor's own words" (not to mention its findings with respect to the high value of the evidence). Moreover, my colleagues are incorrect that I make any factual findings. I simply recount the former prosecutor's testimony, which constitutes the *only* evidence of the reason for nondisclosure, and note that the hearing justice did not explicitly deem this testimony to be not credible. The majority also asserts that, despite his silence on this testimony, "the hearing justice clearly rejected the former prosecutor's proffered reason for failing to disclose the information"; this credibility determination, the majority reasons, is implicit from the hearing justice's "finding that the former prosecutor deliberately failed to disclose the information." This reasoning amounts to an assertion that, by simply stating a conclusion, a hearing justice in the PCR context is relieved of the obligation to state his or her credibility determinations and the reasons for such determinations. In my opinion, this is incorrect. *See* G.L.1956 § 10–9.1–7 ("The court shall make specific findings of fact, and state expressly its

conclusions of law, relating to each issue presented."). In this context, implicit does not carry the day.

15. My conclusion in this regard is unaffected by the hearing justice's single statement in his decision that "the protean nature of Ms. Carrier's testimony * * * was necessarily harmful to the [s]tate's case." The *Wyche* standard for deliberateness is not satisfied any time the suppressed evidence is harmful to the state's case, such as, for example, cases where the evidence is merely cumulative impeachment evidence. Instead, only evidence of such high value to the defense that it could not have escaped the prosecution's attention qualifies for this ground of deliberateness. *Wyche*, 518 A.2d at 910. The hearing justice's finding that the Carrier statements were merely harmful to the state's case cannot be understood as a factual finding that they had the requisite high value discussed in *Wyche*, especially since the hearing justice failed to even mention this prong of the *Wyche* standard in his decision.

for concluding that the majority is clearly wrong.[16] As far as I can tell, the majority's position appears to be that, because the Carrier statements constituted new evidence that was, in light of its impeachment value, favorable to the accused, the high value of this evidence could not have escaped the former prosecutor's attention.[17] However, the high-value prong of the *Wyche* standard for deliberateness is not so summarily satisfied. High-value evidence means powerful proof—so powerful, in fact, that the prosecution could not have overlooked its value to the defense, *see Wyche,* 518 A.2d at 910, as the former prosecutor did in this case with this cumulative impeachment evidence.

As this Court has recognized, cases involving *deliberate* suppression—as that concept has been defined in our case law—"rarely present a problem as to the degree of prejudice [that] must be shown; *almost by definition the evidence is highly material.*" *Lerner,* 542 A.2d at 1092 (quoting *Keogh,* 391 F.2d at 147) (emphasis added). This language indicates that—while a full-blown inquiry into whether the evidence is material under the *Bagley* standard is not necessary—some degree of evaluation of the probative value of the evidence must be undertaken in order to conclude that the evidence is of the requisite *high value.* How else can its value be determined? In making its finding, the majority opinion fails to address this important point. Nor does the majority offer an opinion on precisely what makes this evidence sufficiently valuable. A comparison of the Carrier statements to the evidence in *Lerner* and *Wyche*—the only two *Brady* cases from this Court where a deliberate nondisclosure was found—convinces me that the Carrier statements do not satisfy *Wyche's* high-value prong.

In *Wyche,* 518 A.2d at 907, 908, a first-degree sexual assault case, the prosecutor deliberately withheld evidence relating to the victim's blood-alcohol concentration on the morning that the offense was allegedly committed. The prosecution first learned of this evidence the day before the examining physician took the stand, but it did not disclose the evidence until after the jury returned its guilty verdict. *Id.* at 908. This Court held that "[t]he prosecutor's conduct in this case was unquestionably deliberate," *id.* at 910, and that, notwithstanding the admission of some testimony from the victim about the number of drinks she consumed, *id.* at 907–08, 909, "[t]he extremely high reading of alcohol in [the victim's] blood, [.208,] coupled with the impact that such scientific evidence has on juries, was certainly evidence of such 'high value' to [the defendant] that it could not have eluded the prosecutor," *id.* at 910. The Court went on to conclude that, "[g]iv-

---

16. In doing so, I employ the same deferential standard of review that this Court employs when reviewing the factual findings of a hearing justice, even though I am uncertain whether the majority's findings are entitled to such deference.

17. The majority also seeks to establish the high value of the Carrier statements by contrasting the former prosecutor's nondisclosure of these statements with his disclosure of the fact that Carrier was mistaken about where Tempest lived on the date of the murder. According to the majority, the former prosecutor disclosed Carrier's mistake to the defense after "[h]aving realized that [the mistake] was of high value to the defense because it seriously discredited much, if not all, of Carrier's testimony about seeing Tempest on the day of the murder." After scouring the record, I can find no support for this assertion about why this disclosure was made. Therefore, it is clear to me that this assertion represents nothing more than an unsupported factual finding by the majority. As such, it is not a legitimate foundation upon which to base a second factual finding of the majority—and not the hearing justice—about the high value of the Carrier statements.

en the strength of the facts in this case, even were we to apply the *Bagley* reasonable-probability standard of materiality, [the] defendant would be entitled to a new trial." *Id.*

Similarly, in *Lerner*, 542 A.2d at 1089–90, many years after the defendant was convicted of murder, the chief prosecution witness admitted in a subsequent related trial that, at the direction of Federal Bureau of Investigation (FBI) Special Agent Paul Rico (Rico), he committed perjury while testifying at the defendant's trial. Among other areas of perjured testimony, the witness was instructed by Rico to withhold information about the full extent of promises that Rico made to him in exchange for his testimony against the defendant. *Id.* at 1090. In particular, the witness testified at the defendant's trial that Rico had "promised him only immunity and 'protection for his family' "; he further testified "that he was not promised income from the federal government, a new identity, or relocation." *Id.* at 1091. In actuality, however, Rico had promised the witness income for life, a new identity, and relocation in exchange for his testimony. *Id.* This Court concluded that "[the witness's] perjury at [the defendant's] trial relating to the extent of promises made to [the witness] by the FBI in exchange for his testimony and * * * Rico's corroboration of that perjury were material to [the witness's] credibility and therefore to the issue of [the defendant's] guilt," *id.,* and that "the perjured testimony by [the witness] concerning the promises made to him by the FBI agent is the 'easy case' that requires automatic reversal," *id.* at 1092. The Court went on to note that "[t]he same result would follow even if we were to apply the *Bagley* standard of materiality to [the witness's] perjury." *Id.; see also id.* at 1093 ("[The witness's] perjury, elicited by the FBI, constituted material exculpatory evidence withheld in violation of the applicant's due[ ]process rights.").

Thus, the high value of the undisclosed evidence in these two cases was obvious and substantial and, unlike in this case, was carefully examined by the Court. In *Lerner*, we described the witness who gave perjured testimony as "the critical witness in the state's case" and deemed his perjury "material exculpatory evidence." *Lerner*, 542 A.2d at 1093. Similarly, the victim in *Wyche* was the critical and perhaps the sole witness who testified regarding the first-degree sexual assault that the defendant allegedly committed against her in an "abandoned house"; the medical evidence did not tend to indicate that a sexual assault had occurred. *Wyche*, 518 A.2d at 908. The undisclosed evidence of her profound intoxication at the time of the alleged crime thus severely undermined the reliability of her recollection of the pertinent events. Significantly, these are the only cases in which this Court has applied the *Wyche* deliberate-nondisclosure doctrine, and, in each case, the Court analyzed the undisclosed evidence in light of its relevance at trial and concluded that it was material under the federal standard *and,* critically, not simply impeachment evidence that merely related to "facts that were collateral to the issue of [the defendant's] guilt or innocence." *Lerner*, 542 A.2d at 1090; *see id.* at 1093; *Wyche*, 518 A.2d at 910. None of that careful and considered analysis occurred in this case.

The value of the Carrier statements to Tempest's case does not approach that of the deliberately suppressed evidence in *Lerner* and *Wyche.* First, Carrier was not *the* critical witness against Tempest; she was only one of four witnesses to hear him confess to the murder. Moreover, as the hearing justice implicitly recognized when he declared that the purpose of the nondisclosure was "evidently" to protect Carrier

from "*additional* impeachment" (emphasis added), the Carrier statements were merely cumulative impeachment evidence—which has never been declared to be high-value evidence. With respect to the statement that Gordon put the pipe in the closet, Carrier previously disclosed Tempest's statement that Gordon would not let him get caught and that the weapon had been "taken care of." Additionally, the defense already was in possession of a plethora of discovery relating to Gordon's involvement in the cover-up of his brother's brutal murder of Picard, much of which came before the jury from another witness. The defense had the opportunity to impeach Carrier's testimony on this point, but defense counsel steered clear of using that information for impeachment purposes at trial.

Turning to the statements about the Tempest children being excited about getting a puppy, the defense was in possession of Carrier's grand-jury testimony—in which she testified about her observations of Tempest on the day of the murder—and Carrier was painfully impeached with that testimony in the course of a lengthy cross-examination. Indeed, Carrier admitted before the jury that, contrary to her earlier testimony, she had not seen the things that she claimed to have observed on the day of the murder, including observations of Tempest's movements and the highly incriminating testimony that she saw Tempest return wearing different clothes. In light of defense counsel's devastating cross-examination of Carrier, it is a reach to say that one additional false observation—which concerned Tempest's *children* and not Tempest himself—satisfies the high-value prong of *Wyche*. Carrier's credibility was so effectively destroyed at

trial that any additional impeachment based on the Carrier statements would have been merely cumulative.[18]

Finally, and critically for this prong of *Wyche*, in making its factual finding that the Carrier statements were of such high value to the defense that they could not have escaped the former prosecutor's attention, the majority overlooks the uncontroverted evidence that the value of the Carrier statements to Tempest *did*, in fact, escape the former prosecutor's attention because he considered this evidence to be incriminating. As is clear from his testimony at the PCR hearing, the former prosecutor viewed the Carrier statements as nothing more than belated inculpatory evidence that he would not offer at trial. It was only after Tempest's PCR counsel explained to him how the evidence could have been used to impeach Carrier that the former prosecutor appreciated the evidence's value to the defense. There is no suggestion in this record that his failure to appreciate that the Carrier statements may have been useful for impeachment purposes was not the genuine and forthright testimony of an officer of the court. The hearing justice did not indicate otherwise, and this Court is in no position to assess the credibility of witnesses testifying before a Superior Court hearing justice. This evidence is uncontroverted. In my opinion, the fact that the value of the Carrier statements to the defense actually escaped the former prosecutor's attention is a relevant consideration in determining whether the evidence was of such high value to the defense that it could not have escaped the prosecution's attention. Yet the majority, in its rush to affirm the hearing justice on this alternative ground

---

18. Defense counsel thought so too. At the hearing on Tempest's motion for a new trial, he called Carrier "[t]otally incredible" and stated, "If anybody can believe Donna Carrier, then I'll tell you something[,] I'll sell them the Brooklyn Bridge."

for deliberateness, wholly overlooks this evidence.

For all these reasons, the hearing justice clearly erred in determining that the former prosecutor's nondisclosure of the Carrier statements was deliberate, as our law has defined this term, and the majority perpetuates this error by making its own clearly erroneous factual findings. The evidence simply does not support a finding that either alternative prong of *Wyche*'s standard for deliberateness has been satisfied.

## C. Materiality of the Carrier Statements

Because this case does not approach a deliberate nondisclosure under *Wyche*, Tempest is entitled to postconviction relief only if he can shoulder the burden of establishing that the undisclosed Carrier statements qualify as material evidence under *Bagley*. *See DeCiantis*, 24 A.3d at 571. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Nickerson*, 94 A.3d 1116, 1125 (R.I.2014) (quoting *State v. Burnham*, 58 A.3d 889, 900 (R.I.2013)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Lerner*, 542 A.2d at 1091 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375). Although the majority concludes that the Carrier statements are material, it does so in conclusory fashion.

The materiality of undisclosed evidence must be assessed in light of all of the evidence adduced at trial. *See DeCiantis*, 24 A.3d at 573 ("[B]ased upon our review of the evidence presented at trial, * * * we hold that Mr. DeCiantis has not made the requisite showing of materiality."); *see also United States v. Paladin*, 748 F.3d 438, 444 (1st Cir.2014) ("The strength of

impeachment evidence and the effect of suppression are evaluated in the context of the entire record to determine materiality."); *cf. Smith v. Cain*, — U.S. —, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012) ("[E]vidence impeaching an eyewitness may not be material if the [s]tate's other evidence is strong enough to sustain confidence in the verdict."). After conducting the requisite thorough review of the record, I conclude that the Carrier statements do not give rise to a probability sufficient to undermine confidence in the guilty verdict. To the contrary, the Carrier statements are merely cumulative impeachment evidence.

To begin, I note my disagreement with the majority's assertion that Carrier was "arguably the most credible of the four" witnesses who testified that Tempest confessed to the murder. For one thing, this type of credibility assessment is reserved for the hearing justice, not the members of this Court. The hearing justice made no such credibility determination in the relevant two-and-a-half pages of his decision, and the majority should not have ventured onto this forbidden terrain. In any event, my reading of the trial transcript convinces me that Carrier was the *least* credible witness offered by the state. Carrier admitted during cross-examination that she had not actually seen the things that she had earlier claimed to have observed on the day of the murder. After reading the entirety of the transcript of Carrier's trial testimony, it is my opinion that the inference that Carrier simply made up her day-of-the-murder observations out of whole cloth is inescapable. Of the four witnesses who testified at trial that Tempest confessed to the murder, only Carrier was demonstrated to have fabricated prior testimony.

It is my opinion that Tempest failed to demonstrate that either of the Carrier

statements is material under *Brady.* Carrier's claimed observation of the Tempest children's excitement on the day of the murder was, in light of defense counsel's extremely effective cross-examination as to her other observations from that day, merely cumulative impeachment evidence demonstrating, yet again, that she did not see Tempest on Winter Street on that fateful day. Indeed, this was noted by the hearing justice in his decision, who concluded that the former prosecutor "evidently sought to protect Ms. Carrier from *additional* impeachment." (Emphasis added.) Therefore, it was not material evidence. This Court has consistently declared that merely cumulative impeachment evidence is not material. *See Briggs,* 886 A.2d at 755 n. 8 ("Although impeachment evidence may be found to be material under *Brady* * * *, our subsequent cases have held that a due process violation does not occur when the state fails to divulge impeachment evidence that is merely cumulative."); *id.* at 757, 757–58 ("[I]f the high number of [the witness's] criminal convictions was insufficient to convince a jury that it should disbelieve his testimony, then three additional convictions would not have changed the minds of the jurors. Put differently, this impeachment evidence is merely cumulative. * * * Although [the] defendant could have impeached [the witness's] credibility further with the additional convictions, the fact that [the] defendant did, in fact, impeach [the witness] with the numerous convictions that were disclosed only warrants the conclusion that the additional convictions would not have resulted in [the] defendant's acquittal. Thus, the trial justice properly concluded that they were not material under *Brady.*"); *Chalk,* 816 A.2d at 419, 419–20 ("The defendant's cross-examination of [the witness] delved into his numerous specific acts of misconduct and elicited from [the witness] multiple admissions of mis-

deeds and deception. * * * At most, had [the] defendant received the additional * * * documents earlier, defense counsel may have elicited from [the witness] some additional impeaching admissions. In our opinion, [the] defendant's merely raising the possibility of doing so is not sufficient to establish that, had the evidence been produced sooner, there is a reasonable probability that [the] defendant would not have been convicted. We conclude here, as we did in *State v. Bassett,* 447 A.2d 371, 377 (R.I.1982), that any additional impeaching statements 'would merely have been cumulative for impeachment purposes,' and thus they 'fail[ ] the test of the likelihood that [they] would have produced a reasonable doubt of guilt.' ").

Tempest fares no better with respect to Carrier's statement about Gordon Tempest putting the pipe in the closet, which is closely akin to the claim in her August 1991 statement that Tempest stated: " '[M]y father and brother won't let me get caught.' 'The weapon's been all taken care of[ ]' * * *." Clearly, the defense was in possession of evidence having the same sort of impeachment value as Carrier's undisclosed statement relating to Gordon: Carrier's August 1991 statement, the pretrial statements of Danny Shaw (Shaw) and Ronald Vaz (Vaz), and, as explained in more detail below, *see* Part II.C, *infra,* the trial testimony of Vaz, Michael Asselin (Asselin), and Robert Boisclair (Boisclair), the locksmiths who placed Gordon and another officer at the scene in possession of the pipe on the day after the murder. Notwithstanding, the defense wisely elected not to proceed down this avenue of impeachment in the course of defense counsel's extensive and lengthy cross-examination of Carrier at trial. Tempest, therefore, cannot demonstrate a reasonable probability that, had this evidence— which defense counsel likely would not

have used—been disclosed to the defense, the result of the proceeding would have been different. Accordingly, the undisclosed Carrier statement relating to Gordon was not material.

Moreover, Carrier was not the only witness who heard Tempest confess. Guarino, Vaz, and Loretta Rivard (Rivard) all similarly testified that Tempest confessed to them that he murdered Picard, and, as I explain in more detail in my cumulative evaluation of the materiality of the Carrier statements and the McMann evidence, *see* Part II.C, *infra,* the state's evidence at trial was overwhelming. Therefore, even if Carrier's credibility had not already been, to use the majority's phrase, "crushed altogether" by defense counsel's cross-examination (as I believe it was) and even if the impeachment value of the undisclosed Carrier statements was sufficiently high to create a reasonable likelihood that the jury would have rejected Carrier's testimony in total, there were still three other witnesses who told the jury about Tempest's confessions. In light of the testimony of these three other witnesses and the other incriminating evidence, *see* Part II.C, *infra,* there is not a probability sufficient to undermine confidence in the outcome of the jury's guilty

verdict that the result of the proceeding would have been different.

For this reason, this case is nothing like *Wearry v. Cain,* —— U.S. ——, 136 S.Ct. 1002, 194 L.Ed.2d 78 (2016), cited by the majority. In that case, "[t]he [s]tate's trial evidence resemble[d] a house of cards, built on the jury crediting Scott's account rather than [the defendant's] alibi." *Id.* at 1006. Scott, the prosecution's "star witness," gave conflicting statements to the police—with which he was impeached by defense counsel at trial—but told the jury that he saw the defendant kill the victim. *Id.* at 1003. The prosecution failed to disclose, however, the statements of two inmates with whom Scott was incarcerated that tended to show that Scott had a motive to inculpate the defendant. *Id.* at 1004. One inmate "hear[d] Scott say that he wanted to 'make sure [the defendant] gets the needle [be]cause he jacked over me.' " *Id.* The other reported that Scott "suggested that lying about having witnessed the murder 'would help him get out of jail.' " *Id.* In my opinion, this evidence—which showed that Scott had a motive to falsely implicate the defendant—is plainly material, and its nondisclosure alone would have constituted a *Brady* violation. But there was even more evidence that the prosecution failed to disclose in *Wearry.*[19]

---

**19.** In particular, Scott's tale of the events leading up to the murder indicated that Hutchinson, who was involved in the murder, ran "into the street to flag down the victim, pulled the victim out of his car, shoved him into the cargo space, and crawled into the cargo space himself." *Wearry v. Cain,* —— U.S. ——; 136 S.Ct. 1002, 1005, 194 L.Ed.2d 78 (2016); *see also id.* at 1003. However, Hutchinson's medical records—which the prosecution did not disclose to the defendant—revealed that he underwent knee surgery nine days prior to the murder; according to an expert witness who testified at the defendant's collateral-review hearing, Hutchinson would not have been able to perform the tasks described by Scott so soon after that

surgery. *Id.* at 1005. Additionally, Scott's testimony was bolstered by another witness, Brown, who testified that, on the night of the murder, he saw the defendant and others with a man who looked like the victim. *Id.* at 1003. Brown also told the jury that he "agreed to testify against [the defendant], not for any prosecutorial favor, but solely because his sister knew the victim's sister," and the prosecutor emphasized Brown's purely altruistic motives during closing argument. *Id.* However, "the [s]tate had failed to disclose that, contrary to the prosecution's assertions at trial, Brown had twice sought a deal to reduce his existing sentence in exchange for testifying against [the defendant]." *Id.* at 1004.

In this case, by contrast, Carrier was not the key witness for the state; there were three more witnesses to whom Tempest confessed, and the state presented additional incriminating evidence. Moreover, Carrier's additional inconsistent statements—which, in my view, constitute merely cumulative impeachment—pale in comparison to the evidence in *Wearry* that the star witness who claimed to have witnessed the murder had reasons for falsely implicating the defendant. The Carrier statements do not reveal any motive to lie; at most, they tend to show that she was fabricating observations on the day of the murder—a circumstance that defense counsel unquestionably demonstrated to the jury at trial.

\* \* \*

In sum, the hearing justice failed to set forth or apply the correct legal standard for a deliberate nondisclosure under *Wyche*. This is an error of law warranting reversal. Additionally, he failed to make factual findings that the former prosecutor made a considered decision to suppress *for the very purpose of obstructing* or that the Carrier statements were of such a high value to the defense that they could not have escaped the former prosecutor's attention. To the extent that the hearing justice made a factual finding regarding the reason for the former prosecutor's nondisclosure—"evidently" to protect Carrier from additional impeachment—it was clearly erroneous. Compounding these errors, the majority makes its own clearly erroneous findings of fact to substantiate the hearing justice's erroneous finding of a deliberate nondisclosure. On this record, the evidence does not support the conclusion that either prong of the *Wyche* standard was met. Additionally, the Carrier statements do not constitute material evidence; instead, this is merely cumulative impeachment evidence.

For all of these reasons, I would hold that the nondisclosure of the Carrier statements was not deliberate under *Wyche* and that the evidence was not material. Accordingly, the hearing justice's grant of postconviction relief on this ground should be vacated.

## II

### The McMann Evidence

The majority's affirmance of the hearing justice with respect to the nondisclosure of the Carrier statements entitles Tempest to a new trial. For this reason, the majority quite correctly declines to address Tempest's other *Brady* claim relating to the McMann evidence. (For reasons discussed below, *see* Part III, *infra*, the same cannot be said for the majority's refusal to address Tempest's witness-coaching claim.) Even if it is assumed that the McMann evidence claim has merit, saying so would serve no useful purpose because Tempest will have the benefit of this evidence in his retrial. *See United States v. Halloran*, 821 F.3d 321, 342 n. 14 (2d Cir.2016) ("[T]he remedy for a *Brady* violation is *vacatur* of the judgment of conviction and a new trial in which the defendant now has the *Brady* material available to her." (quoting *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir.2014) (en banc))).

Because I would vacate the hearing justice's grant of postconviction relief with respect to the Carrier statements, however, I am compelled to state my views on Tempest's other *Brady* claim. In my opinion, the hearing justice abused his discretion in rejecting the state's laches defense to this claim. As explained in more detail herein, my careful and conscientious review of the record below leads me to conclude that, notwithstanding the nondisclosure of the McMann evidence, Tempest

has failed to establish that the defense did not know that Robert Monteiro (Monteiro) did not own the maroon car (McMann car) in 1982 or borrow it from Kevin McMann before he purchased it in 1983. And yet, despite this knowledge—which could have been further confirmed by a simple conversation with his friends and family—Tempest waited until 2013 to begin to develop this claim. If ever there was a case calling out for invocation of the doctrine of laches, this is that case. In addition, and completely apart from the alternative ground of laches, the claim fails on its merits because the McMann evidence does not qualify as material evidence.

## A. Background

Before addressing the legal issues with respect to this claim, I first briefly sketch the relevant background. At Tempest's trial, Lisa LaDue (LaDue) testified that, on the day of the murder, she returned to her apartment on 409 Providence Street at approximately 3:20 p.m. LaDue testified that, when she arrived home, she observed a "big," "older" "maroon car" that she did not recognize in the driveway of 409 Providence Street. Upon entering the building, LaDue "heard some moving around [in the basement] downstairs." Douglas Heath (Heath), LaDue's stepfather, arrived at 409 Providence Street at 3:30 p.m. Heath testified that there were no vehicles in the driveway when he parked his truck there that afternoon.

Richards testified that, between approximately 4:30 and 4:45 p.m. on the day of the murder, she observed Tempest in front of her house, "standing on the outside of Bobby Monteiro's car with the door partly open[,] talking to him." Richards then testified as follows:

"Q Would you describe Bobby Monteiro's car?

"A It's maroon, four door, and I'm not sure about the type of car. It was a huge car, maybe a Chevrolet or Oldsmobile.

"Q Was that his car or was it a car that he just drove?

"A No, he used to borrow Kevin McMann's car. *He would later on purchase the car but not at that time.*" (Emphasis added.)

Vaz also testified that Tempest told him that, after the murder, he, Shaw, and Monteiro left the crime scene in "Bobby Monteiro's car."

It is undisputed that the expected testimony of LaDue and Richards concerning the maroon car was disclosed to the defense before trial. In fact, in her police statement, Richards stated the following:

"Corky[, Tempest's sister and Monteiro's wife,] was telling me about how the car I said [Monteiro] had on the day of the murder was not sold to them as of that time. She tried to tell me that the car was his brother[']s which was the same color but different make. I know the car I saw him in was the one that he bought from Lee's [Pharmacy[20]] and that I had seen him driving around in that car several times at that time and that is why I thought he already owned it."

During the defense case, Martin Leyden (Leyden), an employee of the Rhode Island Registry of Motor Vehicles (DMV), testified. Leyden's testimony established that neither Monteiro nor his wife owned a vehicle—maroon or otherwise—registered with the DMV until 1983. In 1983, "a '75 Buick, two[-]door, red" automobile was registered to the Monteiros. There is no dispute that this car is the McMann maroon car. Therefore, although Richards

---

**20.** John McMann was a part owner of Lee's Pharmacy, Inc.

described the McMann car as a four-door model, it had two doors. Despite knowing about this inconsistency, defense counsel did not cross-examine Richards on this point. During closing argument, the former prosecutor twice mentioned that the maroon car observed by Richards and La-Due was the one that Monteiro borrowed from Kevin McMann (Kevin).[21]

At the hearing on Tempest's motion for a new trial, defense counsel argued that the evidence at trial showed that "[Monteiro] didn't own a vehicle, nor did his wife own a vehicle" at the time of the murder. The following exchange then occurred:

"THE COURT: The fact [that] he doesn't have a vehicle registered to him doesn't mean he didn't have the use of a [maroon] vehicle.

"[Defense counsel]: You can infer that."

When defense counsel continued his argument that the state's evidence connecting Tempest to the crime was rather weak, the trial justice responded: "[T]here's no doubt in the [c]ourt's mind that the connection [of] the [d]efendant to the crime was all furnished by his own words."

Time marched on, and, in the intervening years, several of the important actors in this saga passed away. Carrier died in 2004. Defense counsel and Guarino died in 2006. Richards passed away in 2007. Additionally, Colleen "Corky" Monteiro (Corky), Tempest's sister and Monteiro's wife, has died as well.

The issue about the McMann car was not unknown to the defense. In 2001, a private investigator working on Tempest's case located a letter from John McMann

Jr. (John), Kevin's father, in the defense team's files that read:

"To [w]hom it may concern:

"Enclosed, find a copy of a [b]ill of sale, for a 1983 Buick, purchased for Lee's Pharmacy[,] Inc., on May 27, 1983.

"The sale of my red Buick [i.e. the McMann car] to the Monteiro[s] took place after I received my new car.

"There is no way[ ] I was without a car[ ] before. I picked up my new one."

The investigator believes that he turned the letter over to Tempest's sister Barbara. Nothing was done.

Twelve years would elapse before any action was taken with respect to this letter. Then, in 2013, another investigator working on Tempest's case interviewed Kevin. It was at this point that Kevin told the investigator that he never loaned the McMann car to Monteiro in 1982 and that he had relayed this information to officers of the Woonsocket Police Department before trial. Kevin also executed an affidavit stating that his father, John, provided a bill of sale to the Woonsocket Police Department to establish when he sold the maroon car to Monteiro.

Sharon McMann–Morelli (Sharon)— John's daughter and Kevin's sister—testified that John informed police during Tempest's trial that he did not lend the maroon car to Monteiro before he sold it to him in 1983.[22] John's disclosure allegedly was prompted by a Woonsocket Call article discussing the trial that mentioned that Monteiro borrowed the McMann car on the day of the murder. Sharon testified that John allegedly spoke with then-Chief Rodney Remblad (Remblad). Similarly, Kevin testified at the PCR hearing that, at

---

21. To distinguish Kevin McMann from his father, John, and his sister, Susan, I refer to the McManns by their first names.

22. John was unable to testify at the PCR hearing because he had been suffering from the effects of Alzheimer's disease.

his father's request, he too told police during the trial that he never loaned out the car. Kevin testified that he recalled speaking with two officers, and he believed, but was not certain, that one of those officers was Remblad. Inexplicably, however, Kevin never discussed the McMann car with Tempest's defense team. The McMann evidence—that John and Kevin allegedly went to the police during Tempest's trial and what they told the officers—was not conveyed to the former prosecutor or the defense.

Remblad testified at the PCR hearing and flatly denied discussing this issue with John or Kevin. There was no police report reflecting a conversation between either John or Kevin and any officer. The Woonsocket Police Department's case file contained a bill of sale for the 1983 blue Buick Regal that had been purchased by John's business before the sale of the maroon car to Monteiro in 1983—the same bill of sale referenced in the letter from John, addressed "[t]o [w]hom it may concern," that was found in the defense team's files in 2001.

Co-counsel testified at the PCR hearing that he and defense counsel reviewed John's letter that related his purchase of a new vehicle, his sale of the maroon car to Monteiro in 1983, and the fact that John was not without a vehicle before he bought the 1983 Buick. Co-counsel also testified that he spoke with Corky on several occasions before trial, but he does not remember whether any of these conversations involved the McMann car. Nor could co-counsel recall whether he or defense counsel ever spoke with Kevin about the McMann car. Finally, co-counsel testified that, although he is "sure" that he spoke with Tempest about the McMann car and

believes that defense counsel did so as well, he could not recall the specifics of these discussions. This understandable failure of memory of events occurring more than twenty years ago is problematic and leaves many unanswered questions about the McMann evidence, particularly in light of Tempest's testimony at the PCR hearing.

Tempest testified that he was friendly with Monteiro, his sister's husband.[23] In fact, Tempest testified that he was indeed in Monteiro's car on the day of the murder; however, instead of the McMann car, Tempest insisted that Monteiro was driving a green Mercury Comet that day. Additionally, Tempest testified that he and Monteiro did not drive to 409 Providence Street but instead went on a so-called "buzz ride" in which the two smoked marijuana. Tempest further testified that, to his knowledge, Monteiro had not borrowed the McMann car in 1982 and did not purchase it until 1983. Tempest could not recall, however, whether he shared this information with his defense team. This failure of memory is equally problematic. Additionally, although he was released on bail pending trial, he does not recall asking his sister Corky whether her husband borrowed the McMann car in 1982, notwithstanding that Corky was discussing the issue with Richards, a witness for the state.

On the basis of this record, I am not satisfied—and it is impossible to conclude—that the substance of the McMann evidence was new information or that the defense team did not, before trial, explore, discuss, or ask their client, Kevin, John, Corky, or Monteiro himself whether Monteiro borrowed the McMann car. Because defense counsel was in possession of Rich-

**23.** Monteiro was convicted of four counts of perjury based on his testimony before the grand jury, which purported to establish an

alibi for Tempest. *See State v. Monteiro,* 632 A.2d 340, 340–41 (R.I.1993) (affirming this conviction).

ards' police statement in which she claimed to have seen Monteiro driving the vehicle "several times" around the time of the murder, including on the day of the murder, and because Tempest's attorneys spoke with John, Corky, and their client before trial, it is inconceivable to me that this subject was not examined by the defense. Of course, we will never know what defense counsel did in relation to this issue before trial because Tempest waited until after defense counsel died before seeking to develop this claim. Based on this delay, the state cannot defend against this claim twenty-two years later.

The hearing justice, on the other hand, rejected the state's laches defense and found a *Brady* violation with respect to the McMann evidence. First, the hearing justice found that both John and Kevin told police that they did not lend the maroon car to Monteiro before John sold it to him in 1983. Although the hearing justice determined—notwithstanding Tempest's argument to the contrary—that the nondisclosure was not deliberate under the *Wyche* doctrine, he concluded that Tempest was entitled to postconviction relief because the McMann evidence was material.

### B. Laches

An action for postconviction relief is a civil proceeding, *Campbell v. State*, 56 A.3d 448, 454 (R.I.2012), subject to the same rules and statutes applicable in civil proceedings and affirmative defenses available in the civil context, *see* § 10–9.1–7, including the affirmative defense of laches, *see Santos v. State*, 91 A.3d 341, 344 (R.I. 2014); *Raso v. Wall*, 884 A.2d 391, 394 (R.I.2005). "[L]aches is an equitable defense that precludes a lawsuit by a plaintiff who has negligently sat on his or her rights to the detriment of a defendant." *Santos*, 91 A.3d at 344 (quoting *School Committee of Cranston v. Bergin–An-*

*drews*, 984 A.2d 629, 644 (R.I.2009)). To prevail on a laches defense, the state must prove by a preponderance of the evidence that (1) the PCR "applicant unreasonably delayed in seeking relief" and (2) the state was "prejudiced by the delay." *Id.* (quoting *Heon v. State*, 19 A.3d 1225, 1225 (R.I.2010) (mem.)).

It is incumbent upon this Court to review the hearing justice's laches determination in a deferential manner. "Whether or not there has been unreasonable delay, and whether the state has been prejudiced by the delay, are both questions of fact, which require that specific determination[s] * * * be made in light of the circumstances of the particular case." *Santos*, 91 A.3d at 345 (quoting *Heon*, 19 A.3d at 1225). Consequently,

"[f]or the purposes of appellate review, the application of the defense of laches is generally committed to the discretion of the [hearing] justice. * * * [This Court] will not reverse the [hearing] justice's decision on what constitutes laches on appeal unless it is clearly wrong." *Id.* at 344 (quoting *Bergin–Andrews*, 984 A.2d at 644).

Our deferential review, however, must not be confused with rubber-stamp approval of a hearing justice's treatment of a laches issue. As this Court has explained:

"Judicial discretion is necessarily broad—but it is not absolute. Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *Hogan v. McAndrew*, 131 A.3d 717, 722 (R.I.2016) (quoting *Independent Oil and Chemical Workers of Quincy, Inc. v. Procter & Gamble Manufacturing Co.*, 864 F.2d 927, 929 (1st Cir.1988)).

Along similar lines, clear error exists when "the reviewing court[,] on the basis of the entire evidence[,] is left with the definite and firm conviction that a mistake has been committed." *Bido*, 941 A.2d at 835–36 (quoting *Perez*, 882 A.2d at 588). This Court can, in appropriate circumstances, hold that a lower-court justice abused his or her discretion in rejecting a laches defense. *See, e.g., Pukas v. Pukas*, 104 R.I. 542, 548, 247 A.2d 427, 430 (1968). In my opinion, this is such a case. In this case, there has been an egregiously unreasonable delay that has resulted in such prejudice to amount to a manifest injustice, all of which is compounded by the hearing justice's erroneous findings.

In rejecting the state's laches defense in this case, the hearing justice focused exclusively on the unreasonable-delay prong. First, the hearing justice explained that, because Tempest "lacked the funds with which to retain a postconviction attorney," Tempest "took it upon himself to repeatedly write letters to a minister * * * who ran an innocence project * * * whom he had heard about from fellow inmates." The hearing justice also emphasized that the state had put forth no evidence demonstrating that the Office of the Public Defender (Public Defender) would have been able to take the case, dedicate sufficient resources to developing Tempest's claims, and bring the PCR application faster than Tempest's counsel. The hearing justice characterized the necessary investigation of Tempest's case as a "Herculean task," and he emphasized the complexity of the case. Additionally, the hearing justice noted the efforts of Evelyn G. Munschy (Munschy), which involved "hunt[ing] through the case file of [the defense team]" and "spen[ding] approximately thir-

ty to forty thousand dollars of her own personal money to hire a private investigator * * * to look into Mr. Tempest's case." The hearing justice also chronicled the efforts of Betty Anne Waters to obtain DNA testing on Tempest's behalf.[24] Finally, the hearing justice noted the substantial attorney hours expended by Tempest's PCR attorneys. None of these observations address the issue of whether there was unreasonable delay *with respect to the McMann evidence claim.*

Before the hearing justice, the state sought to invoke the doctrine of laches as a complete bar to all of Tempest's claims. On appeal, the state has narrowed the focus of its laches argument; it now invokes the doctrine only with respect to Tempest's *Brady* claim relating to the McMann evidence. The hearing justice erroneously failed to address whether laches should bar discrete claims, as he was required to do. Instead, he made sweeping—and, in my view, flatly incorrect—assessments on such matters as the complexity of the case, Tempest's statutory right to counsel, and the institutional capacity and ability of the Public Defender. These generalizations are simply inapplicable to the *Brady* claim involving the McMann evidence.

Complexity, for example, clearly does not weigh in Tempest's favor with respect to this claim. Whatever may be said for the other PCR claims he asserted, Tempest's *Brady* claim relating to the McMann evidence was anything but complex; it was straightforward. Tempest knew before trial that Richards would testify that the maroon car that she saw Monteiro with on the day of the murder was the vehicle that

---

**24.** Although Tempest asserted PCR claims based on the evidence of DNA testing, the hearing justice rejected those claims because the DNA evidence "[did] not import 'a reason-

able probability of a different result.' " (Quoting *Powers v. State*, 734 A.2d 508, 514 (R.I. 1999).)

he later purchased from the McManns. Tempest also testified that, to his knowledge, his brother-in-law did not borrow the McMann car before the Monteiros purchased it in 1983. Despite actual knowledge and the fact that Tempest and his attorneys could have asked Monteiro, Corky, John, or Kevin about Richards' expected testimony, Tempest did nothing to investigate the claim until 2013. Instead, he sat silent for many years. At the PCR hearing, Tempest could not even recall whether he told his attorneys about what he knew about the McMann car or the vehicle—a green Mercury Comet—that he claimed Monteiro was driving on the day of the murder. This is not reasonable diligence. Moreover, even though defense counsel was in possession of a letter from John that indicated that he was not without a car before he sold the maroon car to the Monteiros in 1983—i.e. he never loaned it to anyone—and, even though that letter was unearthed by a private investigator in 2001, no effort was made to contact Kevin until 2013—twelve years later. During that time period, three trial witnesses, another potential witness regarding the McMann car, and defense counsel all died, and John became unavailable to testify because of disease. The hearing justice overlooked all of this evidence and failed to consider this lengthy period of delay. In this regard, the hearing justice ignored material factors deserving significant weight. *See Hogan*, 131 A.3d at 722.

The hearing justice's reliance on Tempest's lack of resources was erroneous as a matter of law. In accordance with § 10–9.1–5, an indigent applicant for postconviction relief is entitled to be represented by the Public Defender, or appointed counsel when there is a conflict, in connection with a PCR application. Therefore, regardless

of Tempest's financial circumstances, he was guaranteed the right to counsel. The state does not shoulder a burden to establish that an applicant is entitled to appointed counsel or that the Public Defender is up to the job. There is not a scintilla of evidence in this record suggesting that the Public Defender was not capable of pursuing this claim. The hearing justice improperly faulted the state for "present[ing] no evidence that the Public Defender's [o]ffice would have been able to a) take the case; b) dedicate sufficient resources to developing the present claims; or c) bring the petition faster than Mr. Tempest's counsel." With respect to the McMann evidence claim, the prejudicial delay was not the time that was spent actually investigating and developing the claim after an investigator interviewed Kevin in 2013. Instead, the pertinent delay was the inordinate amount of time from Tempest's trial in 1992 until 2013—a period of time when virtually nothing was done with respect to this claim, and during which Tempest knew that Richards' testimony did not comport with his understanding of Monteiro's use of the McMann car and knew the identity of the potential witnesses—Monteiro, Corky, and Kevin—that could have rebutted that testimony. Did a member of the defense team approach Kevin or John about this issue before trial? There is no way of knowing.[25] In those twenty-one years, the McMann evidence, to the extent it existed, could have been discovered and verified or debunked with reasonable diligence.

In fact, the presence of John's letter in the defense team's files suggests that defense counsel met with at least one member of the McMann family about the McMann car. How else could that letter have been prepared and delivered? It

---

25. Although Kevin testified at the PCR hearing that he did not discuss the McMann car

with the defense team, defense counsel was unavailable to provide his side of the story.

seems wholly unreasonable to suggest that, despite knowledge of Richards' expected testimony about Monteiro's use of the car, defense counsel made no inquiry of Monteiro, Tempest, Corky, or the McManns. And, because there was nothing complex about the McMann evidence or its discovery, there is nothing to suggest that the Public Defender was not capable of developing the claim. Tempest simply could have filed a PCR application, obtained appointed counsel, and told counsel of the issue with respect to Monteiro's use of the McMann car.

. The hearing justice clearly erred in basing his decision that the delay was not unreasonable on his assessment of the capabilities of the Public Defender. The constraints under which the members of the Public Defender's office perform their responsibilities—with stunning success, I believe—would not have prevented an investigator of that office from speaking with Kevin, or with John before his illness, about the McMann evidence. Relying on the complexity of Tempest's failed DNA claims to justify the delay—twenty-one years from the date of his conviction and twelve years from the discovery of John's letter in the defense team's files—on the remainder of Tempest's *other* claims is reversible error. From this faulty premise and in the absence of any proof, the hearing justice assumed that the Public Defender was across-the-board unable to develop Tempest's claims in an expeditious manner. In doing so, he constructed an improper factor and then heavily relied on it, to the exclusion of a material factor deserving significant weight: Tempest's unexplained failure to develop this claim, in the face of actual knowledge at the time of trial of Monteiro's use of the car and the several individuals who could have contradicted Richards' testimony that Monteiro borrowed the car from Kevin in 1982, for

twenty-plus years. *See Hogan,* 131 A.3d at 722.

For these reasons, I am of the opinion that the hearing justice's assessment of the unreasonable-delay prong of the laches inquiry was clearly wrong and that he abused his discretion in concluding that the state failed to shoulder its burden on this prong.

The second prong of the laches inquiry—prejudice to the state—was not addressed by the hearing justice, save for his fleeting characterization of the state's effort to carry its burden as "fall[ing] woefully short" because the state "rest[ed] entirely on its cross-examination of witnesses and the offer of nine death certificates into evidence" and the penultimate sentence of his laches analysis: "A thorough rummaging for truth ought not prejudice the [s]tate." Of course, it is not the "rummaging for truth" that prejudices the state, but Tempest's unreasonable delay in bringing the McMann evidence claim and the death of material witnesses during that period of delay. The evidence adduced by the state amply carries its burden to show two types of prejudice: (1) an inability to defend against the claim; and, (2) in the event that the claim succeeds, the difficulties that would accompany a retrial in the circumstances of this case.

For starters, Tempest's unreasonable delay in bringing the McMann evidence claim has prejudiced the state in its ability to defend against the claim itself. This is the essence of laches. Most glaringly, defense counsel's death in 2006 has irrevocably foreclosed any inquiry into whether defense counsel discussed Monteiro's use of the McMann car on the day of the murder with Kevin, John, Monteiro, Corky, or his client. How did John's letter find its way into the defense team's files? We know from John's letter, found in 2001, and the DMV evidence at trial that de-

fense counsel knew that Monteiro did not buy the McMann car until 1983, that the car was a two-door model, and that John would not have been without a car before that sale. We know that the defense was in possession of Richards' statement, in which she stated that she saw Monteiro driving the car several times before he purchased it and that she saw him with it on the day of the murder. Additionally, defense counsel and co-counsel spoke with Tempest about the McMann car, and the defense team also spoke with Corky, Monteiro's wife.

When these established facts—awareness of Richards' knowledge of Monteiro's use of the car, the defense team's discussions with Tempest and individuals who could have evaluated the accuracy of Richards' knowledge, and the trial defense, supported by the DMV evidence, that Monteiro did not own the car until 1983—are considered together, I am not convinced that defense counsel overlooked the question of whether Monteiro borrowed the car in 1982. John's letter establishes that defense counsel was aware of this issue and broached the subject of the McMann car with at least one member of the McMann family.

Unfortunately, because defense counsel died while Tempest delayed bringing the claim, the state was denied an opportunity to pursue this line of inquiry in its effort to defend against the McMann evidence claim. Moreover, defense counsel's death did not follow closely on the heels of Tempest's trial; instead, fourteen years elapsed between these two events. During that time frame, Tempest made no effort whatsoever to raise this claim.

In addition, the state's ability to defend against this claim has been compromised in other respects. During the long period in which Tempest failed to assert this claim, John developed Alzheimer's disease, which rendered him unable to testify and, consequently, be cross-examined, and Kevin has forgotten precisely when he allegedly went to the police and with whom he spoke. The prejudice resulting from the inability to cross-examine John to test his assertion that he met with police about the McMann car is self-evident. This prejudice is compounded by the questions surrounding John's letter, which was found in the defense team's files in 2001. With respect to Kevin's lapses of memory, if only Tempest had asserted his claim in a timely fashion, perhaps Kevin would have been able to accurately identify the police officers with whom he allegedly spoke, such that the officers could verify whether the alleged conversation actually took place. Additionally, if the alleged conversations between the McManns and Remblad and Remblad's testimony at the PCR hearing were closer in time, perhaps Remblad's unequivocal denial that these conversations occurred would have been given more weight. To the extent that any of these lines of defense were viable at some earlier time, Tempest's delay prevented the state from utilizing them.

Finally, apart from any prejudice in defending against the McMann evidence claim, the delay in its assertion clearly will prejudice the state upon remand. For example, Richards is now deceased. On retrial, her former testimony will be admissible. *See* Rule 804(b)(1) of the Rhode Island Rules of Evidence. *But see* Part III, *infra.* However, Tempest may call Kevin as a witness to rebut Richards' testimony that he loaned his car to Monteiro in 1982 generally and on the day of the murder, in particular. Although this option was available to the defense during Tempest's first trial, the balance on this score has shifted decidedly in Tempest's favor in the intervening decades. Kevin's testimony on this point may be unrebutted be-

cause of Richards' death. Notably, in her November 19, 1991 police statement, Richards explained how Corky tried to convince her that she had not seen Monteiro driving the McMann car on the day of the murder; in response, Richards was emphatic about the car that she observed:

> "Corky was telling me about how the car I said [Monteiro] had on the day of the murder was not sold to them as of that time. She tried to tell me that the car was his brother['s] which was the same color but different make. I know the car I saw him in was the one that he bought from Lee's [Pharmacy] and that I had seen him driving around in that car several times at that time and that is why I thought he already owned it."

If she were still living, Richards would be able to explain to the jury the basis of her knowledge and contradict Kevin's testimony in this fashion.[26]

For these reasons, I conclude that the hearing justice's assessment of the unreasonable-delay prong of the laches inquiry was clearly wrong and that his rejection of the state's laches defense—which was based on the failure to consider relevant factors and the improper consideration of other factors—constituted an abuse of discretion. In my opinion, the state carried

its burden of demonstrating that Tempest unreasonably delayed in asserting his McMann evidence claim and that it has been prejudiced by that delay. Accordingly, I would hold that this claim is barred by laches. Notwithstanding this conclusion, however, I am also of the opinion that the claim fails on its merits.

### C. Materiality

As previously explained, *see* Part I.C, *supra,* evidence is material for *Brady* purposes if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Nickerson,* 94 A.3d at 1125 (quoting *Burnham,* 58 A.3d at 900). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Lerner,* 542 A.2d at 1091 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375). This Court reviews the question of whether evidence is material under *Brady* in a *de novo* manner. *DeCiantis,* 24 A.3d at 573. In reviewing the materiality question *de novo,* and even when the McMann evidence is analyzed cumulatively with the Carrier statements as *Wearry,* 136 S.Ct. at 1007, requires, I am convinced that the McMann evidence was not material.[27]

---

**26.** Tempest asserts that a court cannot consider prejudice to the state in retrying a defendant in the laches inquiry. This assertion seems inconsistent with this Court's case law on laches in this context. *See Raso v. Wall,* 884 A.2d 391, 396 n. 14 (R.I.2005) (suggesting that "[t]here may well be much merit in" the state's argument that it was prejudiced for purposes of laches because "[i]t might [have been] virtually impossible at [that] point in time, 20 some years later to try" the defendant).

**27.** Tempest claims that, because the state failed to argue to the hearing justice that the McMann evidence was not material, the state's materiality argument has been waived. I am unpersuaded by this contention. First, materiality of the McMann evidence was

treated as little more than an afterthought by Tempest below. The clear thrust of Tempest's argument below was that the nondisclosure of the McMann evidence was deliberate under the *Wyche* doctrine; materiality of the evidence was addressed only briefly in one paragraph of Tempest's proposed findings of fact, which were filed on the same day as the state's proposed findings. Thus, it is hardly surprising that the state similarly focused on the *Wyche* doctrine for this evidence. Moreover, materiality is an essential element of a *Brady* claim, *see Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), and this Court reviews the materiality determination *de novo, see DeCiantis v. State,* 24 A.3d 557, 573 (R.I.2011). This Court is therefore obligated to consider whether this

The hearing justice reached the opposite conclusion. In the hearing justice's opinion, "the assertion that Mr. Tempest was a passenger in a maroon car on February 19, 1982 was integral to the [s]tate's case." He further reasoned that "[t]he statement by Ms. La[D]ue that she saw a maroon car upon returning home the afternoon of the murder, and the corresponding testimony from Ms. Richards that she saw Mr. Tempest standing by a maroon car driven by Mr. Monteiro that same afternoon, constitute the *only* piece of evidence linking Mr. Tempest to the crime scene at the appropriate time." As was true for the hearing justice's treatment of the Carrier statements, this cursory analysis of the materiality of the McMann evidence is flawed.

For starters, the finding that the maroon-car testimony of LaDue and Richards was the only piece of evidence linking Tempest to the crime scene at the appropriate time is erroneous. As our late colleague Justice Bourcier, who presided over Tempest's trial, stated at the hearing on the motion for a new trial: "[T]here's *no doubt* in the [c]ourt's mind that the connection [of] the [d]efendant to the crime was *all* furnished by his own words." (Emphases added.) In my opinion, the trial justice hit the nail on the head.

As mentioned above, *see* Part I.C, *supra*, the materiality of undisclosed evidence must be assessed in light of all of the evidence adduced at trial. *See De-Ciantis*, 24 A.3d at 573; *see also Paladin*, 748 F.3d at 444. And, as this Court has recognized:

> "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him * * *. * * * Certainly, confessions have profound impact on the jury * * *." *State v. Oliveira*, 961 A.2d 299, 313 (R.I.2008) (quoting *State v. Bettencourt*, 763 A.2d 636, 639 (R.I.2000)).

In this case,[28] three separate witnesses—who had little, if any, connection with one another[29]—testified that Tempest confessed to the murder in their presence. Rivard testified that Tempest told her: "Do you remember the girl that was killed in the basement in Woonsocket? * * * I killed her * * * [b]ut I'll get away with it[.] I'm a Tempest[.] I'll slide." Neither the Carrier statements nor the McMann evidence would have had any effect on Rivard's testimony.

Additionally, Guarino testified that, when he and Tempest went to a bar in

---

essential element is met. Finally, Tempest himself raised the issue of materiality of the McMann evidence, and the hearing justice considered that issue, as he was required to do in order to find a *Brady* violation. *See Strickler*, 527 U.S. at 281–82, 119 S.Ct. 1936. Accordingly, the purposes of this Court's raise-or-waive rule are simply not implicated here. *See State v. Isom*, 135 A.3d 1210, 1218 n. 10 (R.I.2016).

**28.** I focus only on Vaz, Guarino, and Rivard because, in my opinion, Carrier's credibility was eviscerated by defense counsel's vigorous cross-examination. *See* Part I, *infra*. When assessing materiality under *Brady*, undisclosed evidence must be viewed cumulatively and not in isolation. *See Wearry*, 136 S.Ct. at

1007; *Kyles v. Whitley*, 514 U.S. 419, 436, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Therefore, favorably to Tempest, I completely disregard Carrier's trial testimony in assessing the materiality of the McMann evidence on the assumption that the undisclosed Carrier statements would have caused the jury to completely reject her testimony: a circumstance I am convinced transpired even without the Carrier statements.

**29.** Rivard did not know Vaz or Guarino. Vaz and Guarino knew each other through Tempest, although it is clear from the record that the two had met each other on only a handful of occasions.

Providence, he asked Tempest whether he committed the murder. Guarino further testified that Tempest:

> "told me he went into the basement of the house where the Picard girl lived and he said that he had—his right hand was moving up and down when he was talking to me and he told me that he hit one of them over the head and another woman came down [into the basement] and he had to beat her up, too."

Guarino also told the jury about the confession that occurred in his and Carrier's apartment at 448 Winter Street a few weeks later. The McMann evidence would have in no way undermined Guarino's testimony. His testimony would have been similarly unaffected by the Carrier statements. Although, like Carrier, Guarino was a little unclear on the precise date that Tempest confessed to him, first at a Providence bar and again at his 448 Winter Street apartment, there was no other inconsistency between Guarino's police statement and his trial testimony, and no aspect of the Carrier statements contradicted Guarino's trial testimony. This is hardly surprising, since Guarino and Carrier had long since separated before speaking with police.

Additionally, Tempest made numerous incriminating statements to Vaz. Two days after the murder, Vaz saw Tempest jogging in Woonsocket. Vaz pulled his vehicle over to the side of the road, and Tempest approached Vaz. Tempest asked, "Danny [Shaw] told you everything [about it]?" Vaz responded in the affirmative, and Tempest told Vaz that he was in serious trouble and that " '[t]hey'll get me for this one'[;] * * * '[m]y father won't get me out of this one.' " Vaz testified that, on another occasion, Tempest admitted that he and Laferte got into an argument in the basement of 409 Providence Street on the day of the murder. Tempest told him that the argument escalated when Laferte hit Tempest. On yet another occasion, Tempest showed Vaz pictures of the severely beaten bodies of Picard and Laferte and boastfully stated: " 'They said I did a bad job'[;] * * * 'I don't think I did a bad job, do you?' "

Vaz's testimony would not have been impacted by the Carrier statements. Similarly, the McMann evidence would not have affected Vaz's testimony. To be sure, with respect to one of the several independent occasions when Tempest discussed the events surrounding the murder with Vaz, Vaz testified that Tempest explained how he left the murder scene with Monteiro and Shaw in "Monteiro's car." However, Vaz did not testify that Monteiro's car was maroon or otherwise indicate that it was the McMann car.[30] Additionally, unlike Richards, who saw the car, Vaz did not claim that Tempest told him that Monteiro had borrowed the car from Kevin but instead that Tempest referred to the car simply as "Monteiro's car." The jury was also made aware that Monteiro did not have registered ownership of the McMann car or any other vehicle on the day of the murder. In any event, Vaz testified about several other instances in which Tempest made inculpatory statements about this horrific crime, and none of these statements involved Monteiro's car.

Finally, the evidence in this case placed Tempest at 409 Providence Street earlier on the afternoon of the murder. Carol Rivet, Laferte's sister, testified that she was present at 409 Providence Street

---

**30.** In our opinion affirming Tempest's conviction, this Court stated that "Vaz testified that [Tempest] stated that he had left the crime scene with Shaw and Monteiro in Monteiro's big maroon car." *Tempest,* 651 A.2d at 1205. However, a careful reading of Vaz's trial testimony reveals that he nowhere refers to Monteiro's car as "big" or "maroon."

when Tempest and Allard arrived to pick out a puppy and when they left shortly thereafter. Therefore, the state put forth overwhelming evidence—even when the maroon-car testimony of Richards and La-Due is completely disregarded—connecting Tempest to this homicide.

Additionally, there was a plethora of evidence—both from the confession witnesses and from others—that established Tempest's guilty conscience. Vaz, for example, testified that Tempest told him that he was in "some serious trouble." He also recounted an instance when Tempest told Vaz of his fear that Monteiro was "the weak link in [the] case" and that Monteiro would say something about the murder to the wrong person. Vaz further testified that, on yet another occasion, Tempest told him of the fear he experienced when Laferte, who by then had been released from the hospital, arrived at his house. Tempest told Vaz that "he literally shit in his pants" when, in response to a knock on his door, he opened the door and saw Laferte standing there. Tempest also told Vaz "that he thought that the cops were right behind her and that she was going to point the finger to him and say, 'You did this to me.' " [31] Tempest described that event as "the scariest thing that had ever happened to him." Similarly, Guarino testified that, when Tempest discussed the murder at 448 Winter Street a few weeks after confessing to Guarino at a bar in Providence, he appeared "very, very nervous." He told Guarino that the police were watching his house.

Along similar lines, evidence was admitted that there was a cover-up afoot and, importantly, that Tempest was aware of it.

Vaz testified that Tempest gave him the following account of the cover-up. On the day of the murder, Tempest attempted to call his father. When this attempt was unsuccessful, Tempest then called his brother Gordon. Gordon was able to reach their father, along with then-Captain (later Chief) Francis J. Lynch (Lynch) of the Woonsocket Police Department, at the Gridiron Club. Tempest called Gordon again, and Gordon related that their father and Lynch were en route to the crime scene. When they got to 409 Providence Street, Tempest's father parked across the street, and Lynch went into the building and ordered everyone out so that Gordon could wipe the pipe clean. When Gordon was unable to locate the pipe, he told his father, who, in turn, called Tempest for information about where the pipe could be found. After the information was related to Gordon, he went back into the basement, located the pipe, wiped it clean, and changed its location. When police were later unable to find the murder weapon, Gordon and other officers returned to the crime scene to locate the pipe. According to Vaz, when relating this detail, Tempest laughed at the incompetence of the police. On another occasion, Tempest told Vaz that his father had instructed him to get some "strong" alibis. Significantly, many of the details that Tempest disclosed in his confessions to others were corroborated at trial.

Although Lynch, Gordon, and Tempest's father all denied that they participated in any cover-up,[32] testimony from other witnesses supported what Tempest told Vaz. For example, Terrence Gelinas (Gelinas), who, at the time of the murder, lived on Providence Street not far from the crime

---

**31.** As it turns out, Laferte, who had no memory of the attack, simply intended to visit Tempest's wife.

**32.** Gordon was convicted of seven counts of perjury based on the testimony he gave before the grand jury and at Tempest's trial. *See State v. Tempest*, 660 A.2d 278, 279 (R.I.1995) (affirming this conviction).

scene, testified that he ran to 409 Providence Street when he heard rescue personnel respond to the scene. Gelinas saw Tempest's father parked in his car across the street from the crime scene. Additionally, the testimony of the two locksmiths who installed deadbolt locks at 409 Providence Street on the morning after the murder further supports Vaz's testimony about Gordon's involvement in the cover-up and concealment of the murder weapon. One of the locksmiths, Asselin, testified that two police officers were present during their work and that Gordon was one of these officers. The second locksmith, Boisclair, testified that he saw the officers holding a pipe wrapped in a piece of cloth. According to Sgt. Richard Flood (Flood) of the Woonsocket Police Department, he and Gordon returned to the crime scene days later, and it was Gordon who found the concealed pipe and showed it to Flood.

Tempest's knowledge of the cover-up effort was similarly established by the testimony of several witnesses and, in many cases, by his own words. For example, Rivard—a virtual stranger Tempest met in a bar one evening—testified that Tempest not only confessed to her, but also boastfully stated: "I'll get away with it[.] I'm a Tempest[.] I'll slide." Similarly, Tempest related to Vaz the information concerning the cover-up efforts of his father and brother, Lynch, and Maurice Jallette (Jallette) of the Woonsocket Police Department.

Moreover, Tempest's threats to multiple witnesses revealed his knowledge of a cover-up and his guilty conscience. Tempest warned Guarino that he "better keep [his] mouth shut." Likewise, when, many years later, the investigation focused in on Tempest as the prime suspect, he threatened Gelinas in no uncertain terms. Tempest told Gelinas that "[y]ou are going to wish you never got involved in this." He fur-

ther informed Gelinas that he was going to kill Pennington and that his father was going to "take care of other people," including the former prosecutor. Tempest continued: "I wouldn't want to be you. * * * I wouldn't want anybody to talk. [Jallette] and [Gordon] are just waiting. * * * If I get convicted, my father is taking care of you."

For these reasons, my *de novo* review of the entire record convinces me that the state presented overwhelming trial evidence against Tempest. Viewing the Carrier statements and the McMann evidence against this backdrop, I am satisfied that this evidence does not undermine confidence in the jury verdict. There is no reasonable probability that the result of the proceeding would have been different had this evidence been disclosed to the defense. Therefore, I would vacate the hearing justice's grant of postconviction relief with respect to Tempest's two *Brady* claims.

### III

### Witness Coaching

Although the majority correctly concludes that its decision affirming the hearing justice's grant of postconviction relief based on the nondisclosure of the Carrier statements renders a consideration of Tempest's other *Brady* claim unnecessary, this reasoning does not extend to the ruling on Tempest's witness-coaching claim because, if this aspect of the decision is not vacated, it may lead to confusion and unnecessary further litigation. In refusing to address this claim, the majority leaves a gaping hole rather than a clear mandate on remand. I believe that it is incumbent upon the majority to consider this issue because it is not clear what remedy, if any, lies in the face of this ill-conceived due process violation.

The hearing justice employed the eye-witness-identification standard of *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and its progeny to Tempest's witness-coaching claim. As I explain below, the hearing justice erred in doing so. Separate and apart from this erroneous aspect of the hearing justice's analysis of the witness-coaching claim, however, another problematic piece of the decision needs to be addressed by members of this Court. As it stands now, the majority has affirmed the vacatur of Tempest's conviction, and he faces a new trial. What is the remedy, if any, upon remand for the witness-coaching due process violation found by the hearing justice?

The hearing justice does not say in his decision, nor could he have fashioned a remedy; that is not within the parameters of an application for postconviction relief. In the course of finding a due process violation, the hearing justice determined that the testimony of LaDue and Richards relating to the maroon car was "faulty" because it was fostered in an unnecessarily suggestive "environment." [33] He also determined that this testimony "evince[s] an inherent unreliability that undercuts any confidence in such testimony and the resultant verdict." He then suggested that this evidence was "constitutionally inadmissible as a matter of law." (Quoting *State v. Porraro*, 121 R.I. 882, 887, 404 A.2d 465, 469 (1979).)

These rather extraordinary findings—which have no jurisprudential support in this state (or anywhere else, for that matter)—must be understood as limited to the context in which they were made. In the PCR context, the hearing justice's task was limited to determining whether Tempest's "conviction or the sentence was in violation of the constitution of the United States or the constitution or laws of this state." Section 10–9.1–1(a)(1). A PCR hearing justice has no authority to address the admissibility of evidence in a retrial, and nothing the hearing justice stated in his decision should be interpreted as deciding that question.

In fairness to the next Superior Court justice who may be confronted with this issue at the new trial, the majority should have decided this question in order to provide guidance to the parties and the trial justice or to declare it erroneous as a matter of law. The majority's refusal to address this issue will create more litigation in the Superior Court and, quite possibly, again before this Court. However, notwithstanding the majority's unfortunate failure to address this issue, it is clear to me that the trial justice on remand is not bound by law-of-the-case principles or any other doctrine to exclude the testimony of trial witnesses or the use of former testimony of those witnesses who are no longer with us.[34] Furthermore, should this testi-

---

**33.** As far as I can tell, the hearing justice concluded that the admission of only those portions of LaDue's and Richards' testimony that dealt with the maroon car violated due process. I do not read his decision as declaring that the totality of these witnesses' testimony is unconstitutionally unreliable.

**34.** The majority claims that it "would be fruitless" to address the witness-coaching claim because a conclusion that the claim is barred under principles of *res judicata* "would have no effect on retrial." In my opinion, this reasoning is flawed. As it stands today, the

hearing justice's decision on the witness-coaching claim remains undisturbed. On remand, Tempest may argue, and a Superior Court justice might agree, that the hearing justice's determination that the evidence is "constitutionally inadmissible as a matter of law" applies to Tempest's retrial. (Quoting *State v. Porraro*, 121 R.I. 882, 887, 404 A.2d 465, 469 (1979).) Vacating the hearing justice's decision on *res judicata* grounds would eliminate any such danger. Moreover, if the majority simply recognized that the witness-coaching claim fails on its merits, the issue

mony be excluded after a pretrial hearing in Superior Court, the state has a statutory right of review of that decision in this Court prior to the commencement of Tempest's retrial. *See* G.L.1956 § 9–24–32 ("In any criminal proceeding, the attorney general shall have the right to object to any finding, ruling, decision, order, or judgment of the [S]uperior [C]ourt or [F]amily [C]ourt, and the attorney general may appeal the findings, rulings, decisions, orders, or judgments to the [S]upreme [C]ourt at any time before the defendant has been placed in jeopardy * * *."); *see, e.g., State v. Morris,* 92 A.3d 920, 923–24 (R.I.2014) (appeal by state under § 9–24–32 from trial justice's grant of the defendant's pretrial motion to suppress). Should such an appeal come before us, the Superior Court proceedings will be stayed and the Court will confront the issue that it avoids today.

However, there is no basis to employ the reasoning utilized by the hearing justice in this case because, as I explain herein, it is simply wrong. Moreover, it is my opinion that the hearing justice should not have even considered the witness-coaching claim in the first place because that claim was raised and waived at trial, and defense counsel repeatedly emphasized to the jury

and the trial justice that the state's witnesses were unworthy of belief because their testimony had been influenced by Sgt. Ronald Pennington (Pennington) and other officers. Thus, that claim is now barred by principles of *res judicata.* For either or both of these reasons, Tempest was not entitled to postconviction relief on this claim.

## A. Background

A brief background of the relevant portions of the record is necessary to put this issue in proper context. Before trial, defense counsel took the position that, due to the manner in which the police interviewed witnesses in this case, much of the testimony offered against Tempest was suspect. Defense counsel filed a pretrial motion to dismiss the indictment on due process grounds, alleging that the police had suborned witness perjury and "intimidated witnesses to give false statements and testimony." Before the jury was empaneled, the motion was, at defense counsel's request, held, and there is no indication that defense counsel pressed this motion any further. This amounts to waiver.

Defense counsel did, however, raise the same issue to the jury throughout trial. A review of his cross-examinations of Rich-

---

would not even come up at the retrial. *Cf. Harvard Pilgrim Health Care of New England, Inc. v. Gelati,* 865 A.2d 1028, 1039 (R.I.2004) ("[W]e address several of the city's arguments that are *likely to arise in conjunction with our remand* of the 1999 assessments." (emphasis added)). Finally, the majority cannot justify its failure to address this issue by invoking then-Judge (now Chief Justice) Roberts' pithy phrase that "if it is not necessary to decide more, it is necessary not to decide more." (Quoting *PDK Laboratories, Inc. v. United States Drug Enforcement Administration,* 362 F.3d 786, 799 (D.C.Cir.2004) (Roberts, J., concurring in part and concurring in the judgment)). As the Chief Justice has since explained:

"It should go without saying * * * that we cannot embrace a narrow ground of decision simply because it is narrow; it must also be right. Thus while it is true that '[i]f it is not necessary to decide more, it is necessary not to decide more,' * * *, sometimes it *is* necessary to decide more. There is a difference between judicial restraint and judicial abdication. When constitutional questions are 'indispensably necessary' to resolving the case at hand, 'the court must meet and decide them.'" *Citizens United v. Federal Election Commission,* 558 U.S. 310, 375, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (Roberts, C.J., concurring) (quoting *Ex parte Randolph,* 20 F.Cas. 242, 254 (C.C.Va.1833) (No. 11,558) (Marshall, C.J.)).

ards and LaDue—the two witnesses of concern to the hearing justice—as well as Pennington demonstrates that defense counsel consistently sounded this theme. Indeed, Richards admitted on cross-examination that she had been questioned by police—and by Pennington in particular—on several occasions. Richards testified that Pennington "kept asking me the same questions over and over and over and over going again hour after hour until I could give him an answer." She also stated that Pennington "kept * * * getting upset with me when I told him I couldn't remember because at the time I could not remember. He told me that is no answer, that I could not give that answer that I can't remember." Critically, Richards even acknowledged that Pennington "[s]ometimes" "put words in [her] mouth," and she further testified that "[h]e started the statements and I would finish them."

LaDue similarly was subjected to vigorous cross-examination at the hands of defense counsel. In particular, defense counsel focused on her sudden recollection of seeing the maroon car in the driveway of 409 Providence Street ten years earlier. Although LaDue claimed that she simply did not disclose this recollection because her interviewers did not ask whether she saw this vehicle, cross-examination suggested that she had been encouraged by Pennington to give testimony about a maroon car. When asked whether Pennington "remind[ed] [her] that [she] saw a maroon car," LaDue answered: "Yes. He asked me if I seen [sic] any cars."

Defense counsel also subjected Pennington to a lengthy and forceful cross-examination. Defense counsel elicited testimony from Pennington that he interviewed all of the key state's witnesses and that he spoke with many of them shortly before trial. During questioning, defense counsel referred to Pennington as "the common de-

nominator" with respect to the statements of the various witnesses.

During closing argument, defense counsel once again stressed his theme that the testimony of the state's witnesses was unworthy of belief because of the suggestive manner of the police's investigation. He described for the jury "a consistent pattern in this case where everybody is struck by lightning in 1991 and 1992 and remember[s] things that they never told the police before." Defense counsel argued that Pennington persuaded "people to lie in 1991 and 1992" and "fabricate[d] and manufacture[d] a case against [Tempest]." Pennington, defense counsel told them, simply "[made] the pieces fit into the puzzle." He suggested that LaDue had fabricated her recollection of the maroon car after Pennington had suggested that she do so. Similarly, he argued that Richards' testimony was the product of Pennington's repeated questioning of Richards until she gave him the answer that he wanted to hear. The jury rejected this defense.

At the motion for a new trial, defense counsel reiterated these arguments to the trial justice. With respect to Richards, defense counsel argued:

"[Richards] testified that words were put into her mouth. She testified, your Honor, that * * * Pennington would start a sentence of her statement and she would have to complete it. Again, the implication, your Honor, [is] that the testimony was coerced and the testimony is untrue, and I ask the [c]ourt to consider that, considering the course and nature of the methods of interrogation of Miss Richards, and I respectfully submit to the [c]ourt, your Honor, that that testimony should be discounted."

Defense counsel also emphasized that Vaz suspiciously claimed to have additional detailed recollections shortly before trial. Additionally, defense counsel unsuccessful-

ly pressed similar arguments regarding the credibility of the witnesses in his brief before this Court on the direct appeal from Tempest's conviction. In particular, he argued that:

"It was * * * painfully obvious that the Woonsocket Police Department, particularly * * * Pennington, influenced [Richards'] testimony. The heavy[-]handed and coercive nature inherent in the handling of this witness should have disparaged her testimony on many levels."

At the PCR hearing, Pennington testified that, at times during the Picard investigation, he would "suggest[ ] facts the witness had not raised to prod [the witness's] memory." He also testified that he interviewed Richards more than ten times.

Edward F. Davis (Davis), the former police commissioner of the City of Boston, also testified at the PCR hearing as an expert witness on proper police practices and procedures during the period from 1982 to 1992. Davis testified that Pennington's technique of suggesting facts when interviewing witnesses was not a proper police practice and is "extremely problematic in any investigation" because it can lead "a witness [to] craft a statement that is not true [but, at the same time, is] very believable." Davis explained that this practice creates "a danger of planting information in [the witness's] mind that will eventually be regurgitated * * * as if the witness knows it." Davis also testified that the preferable police practice when interviewing a witness is to conduct "one long interview that is very thorough" as opposed to several interviews.

After hearing this testimony—which, in my opinion, closely resembled inadmissible expert testimony on witness credibility—the hearing justice considered Tempest's witness-coaching claim, but he declined to "discuss each piece of allegedly tainted evidence." Instead, the hearing justice elected to examine "the more propitious of Mr. Tempest's claims." The hearing justice thus limited his analysis of Tempest's witness-coaching claim to two witnesses who testified at trial—Richards and LaDue—and a third individual—Shaw—who did not testify at trial (and is, therefore, wholly irrelevant to this claim).

The hearing justice, noting that Pennington interviewed Richards more than ten times, found that "her story shifted in lockstep with the [s]tate's theory of the case." He explained that: first, Richards claimed to have not seen Tempest arrive at her house after the murder; then she "suddenly remember[ed] Mr. Tempest's return and vividly recall[ed] the sight of him standing by Mr. Monteiro's car on the day of the murder"; and, finally, "[w]hen the police discovered Mr. Monteiro did not own the car at this time, her narrative changed once again—the maroon car transmogrified into one that Mr. Monteiro 'used to borrow[.]' " Relying on Davis's opinion testimony, the hearing justice concluded:

"With regard to the evolving statements by Ms. Richards, * * * Davis opined that she was 'attempting to correct the record' in matching her account to police theorizing—'an indication of coaching by the detectives.' * * * As such, it is clear that Ms. Richards, after being subjected to a barrage of recurrent suggestive questioning, was led to conform her statements to the prosecution's case theory."

The hearing justice also offered the following assessment of LaDue's testimony:

"In three interviews following the murder, she never mentions seeing an unfamiliar car in the driveway at the house. * * * Then, ten years later, Ms. La[D]ue has a revelation. Following a phone conversation with * * * Penning-

ton, her memory is conveniently jogged. Just in time for trial, she miraculously recalls seeing a strange car parked outside 409 Providence Street on that fated day ten years prior. The color of this car? Maroon. After a decade-long amnesia, Ms. La[D]ue is now able to provide police with exactly what they want—eyewitness testimony linking Mr. Tempest to the scene."

The hearing justice concluded his discussion of these witnesses by stating that "the dramatic shift in the statements of Ms. Richards and Ms. La[D]ue self-evidently would not have occurred without police prompting."

Finally, the hearing justice deemed a recording of a conversation between Remblad and Shaw to be "the most telling example of police coaching." Because Shaw was not called as a witness at Tempest's trial,[35] the hearing justice conceded that "[Shaw's] improper questioning [by police] cannot serve as a basis for a due process violation." Nonetheless, he proceeded to consider this evidence from an institutional standpoint and reasoned that the recording of the Shaw conversation "provide[d] invaluable insight into the interrogation techniques of the Woonsocket Police Department at the time and how [Shaw's] statements were shaped prior to his testimony before the [g]rand [j]ury that would indict Mr. Tempest." The hearing justice noted that, during this conversation (which occurred outside a Woonsocket bar), Shaw, who may have been an eyewitness to this murder, was "very intoxicated"—so much so that he "struggled

to string together a coherent sentence." He further explained that, in what he characterized as "apparent" "manipulation of Mr. Shaw by police," Remblad "pushed Mr. Shaw to implicate Mr. Tempest," "fed a motive to Mr. Shaw," and "coached Shaw on how the murder took place." The hearing justice then relied on Davis's opinion about the conversation to conclude that it was improper:

"As * * * Davis testified, 'a commander of the Police Department who is four ranks above a detective * * * just bump[ing] into * * * somebody at 11:00 at night outside of a barroom' is 'really problematic.' * * * He noted that * * * Remblad 'crossed the line into coaching' in 'offering a smorgasbord of facts that the witness c[ould] pick from[.]' * * * Additionally, he found that 'planting reasons for motive in the case to the witness' that the witness can then adopt within his or her own narrative, as * * * Remblad did with Mr. Shaw, 'is a huge problem.' * * * The same holds true for * * * Remblad's provision of facts relative to the manner of attack—'The role is to find out what that * * * witness knows, not to tell them what happened at the crime scene.'"

In finding a due process violation in the actions of the police, the hearing justice concluded: "[C]onfidence in the verdict rested on a faulty record; due process strictures necessitate vacation of Mr. Tempest's conviction."

35. The former prosecutor testified at the PCR hearing that Shaw was "a witness from hell." He explained that Shaw "came with a lot of baggage" and "was really mentally unstable." He also testified that Shaw lied to him. The final straw was when, in January 1992, Shaw recanted his statements inculpating Tempest and claimed that Remblad had forced him to say he was present for the murder; then, "immediately" thereafter, Shaw "reversed completely 180 degrees and said he was kidding" about his recantation. The former prosecutor explained that "that [was] about the time that we decided we had about enough of [Shaw]," and he was not called as a witness.

## B. *Res Judicata*

The doctrine of *res judicata* is codified in § 10–9.1–8, *see Campbell*, 56 A.3d at 457, which provides that:

"All grounds for relief available to an applicant at the time he or· she commences a proceeding under this chapter must be raised in his or her original, or a supplemental or amended, application. *Any ground* finally adjudicated or not so raised, or *knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction* or sentence or in any other proceeding the applicant has taken to secure relief, *may not be the basis for a subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such a ground for relief.*" Section 10–9.1–8 (emphases added).

In this case, defense counsel raised this due process witness-coaching ground in a pretrial motion and consistently emphasized—to the jury, the trial justice, and this Court—the effects of the investigation on the credibility of the state's witnesses. The question presented is whether, "in the interest of justice[, Tempest] should be permitted to assert," § 10–9.1–8, this argument—which otherwise would unquestionably be barred by *res judicata*—in this PCR action. This Court has explained that, although the applicability of the interest-of-justice exception is case-specific, "there nevertheless must be some sufficient finding, articulation, or explanation by the motion justice that an issue barred by the doctrine of *res judicata* merits consideration in the interest of justice." *Ferrell v. Wall*, 971 A.2d 615, 621 (R.I.2009).

The hearing justice erroneously determined that the *res judicata* principles enshrined in § 10–9.1–8 did not bar Tempest's witness-coaching claim because of the interest-of-justice exception. This conclusion was premised on the hearing justice's determination that Pennington's testimony at the PCR hearing that he would "suggest[ ] facts the witness had not raised to prod [the witness's] memory" constituted newly discovered evidence that "confirmed" "Tempest's past conjecture regarding the possibility of such witness coaching." It was the hearing justice's opinion that this testimony established "that the police fed witnesses information in an effort to move the case against Mr. Tempest forward." The hearing justice thus concluded that, "[i]n light of this new evidence, the [c]ourt finds that justice requires a *second look* at Mr. Tempest's claims of police-tainted witness testimony." (Emphasis added).

In my view, the hearing justice erred in invoking the interest-of-justice exception to the § 10–9.1–8 *res judicata* bar because Pennington's testimony at the PCR hearing did not amount to new evidence. Contrary to the hearing justice's conclusion, defense counsel already knew that the police· conducted numerous witness interviews and suggested facts "in an effort to move the case against Mr. Tempest forward" because Richards had admitted as much at trial. According to Richards, Pennington told her that "I don't remember" was not an acceptable answer and continually pressed her for an answer when she stated that she could not recall. Additionally, Richards testified that Pennington "[s]ometimes" "put words in [her] mouth" and "started the statements and I would finish them."

This testimony clearly conveys the same message as that related by Pennington at the PCR hearing: In an effort to prod a witness's memory, he suggested facts known to the police at the time. The hearing justice overlooked Richards' trial testimony in his haste to avoid the *res judicata* bar of § 10–9.1–8. Had he not

done so, he would have concluded that Pennington's testimony cannot be considered "new" evidence that warrants invocation of the interest-of-justice exception. Because this decision does not set forth a *"sufficient* finding, articulation, or explanation by the [hearing] justice that an issue barred by the doctrine of *res judicata* merits consideration in the interest of justice," *Ferrell,* 971 A.2d at 621 (emphasis added), the exception does not apply. That alone is reason to vacate the hearing justice's decision on this point. But there is an additional reason to do so: The decision is wrong as a matter of law.

## C. Merits

In selecting the legal standard to apply to Tempest's witness-coaching claim, the hearing justice noted that Tempest's claim was "analogous to the due process concerns surrounding impermissibly suggestive eyewitness identifications." For this reason, the hearing justice adopted the two-part inquiry employed in analyzing unduly suggestive eyewitness identifications:

> "Under this doctrine, a trial justice 'must consider whether the procedure used * * * was unnecessarily suggestive.' *State v. Brown,* 42 A.3d 1239, 1242 (R.I.2012). If this consideration is answered affirmatively, a second inquiry is engaged, examining whether the 'totality of the circumstances' indicate that—despite police misconduct—the elicited statement is 'nonetheless reliable.' *State v. Gallon [Gallop* ], 89 A.3d 795, 801 (R.I.2014) * * *."

Applying this standard to witness interviews, the hearing justice declared: "When interviews rise to the level of being impermissibly suggestive, information derived therefrom becomes 'so defective as to make the [evidence] constitutionally inadmissible as a matter of law.'" (Quoting *Porraro,* 121 R.I. at 887, 404 A.2d at 469.)

None of the cases cited by the hearing justice fit the square peg that is a witness-coaching claim into the round hole of the eyewitness-identification standard. When asked at oral argument before this Court, Tempest conceded that he was unaware of a single case in which this mishmash was attempted. As far as I can tell, this is the first time a judge in this country has sought to engraft the eyewitness-identification due process rubric to claims that the police improperly coached witnesses. This dearth of authority is understandable, because to do so would turn a criminal trial into an endless pretrial hearing about the manner in which the police investigated the offense and whether the officers' conduct crossed an amorphous divide drawn by the hearing justice. In braving this new terrain, the hearing justice strayed far afield.

As an initial (and, in my view, dispositive) matter, the hearing justice's inventive approach ignores principles of *stare decisis.* The hearing justice was not writing on a clean slate. In *State v. Garcia,* 743 A.2d 1038 (R.I.2000), the defendant claimed that, because "the police statements and trial testimony given by two of the witnesses against him were *coerced"* (not merely coached), "his federal constitutional right to due process of law was violated" by the admission of the witnesses' testimony. *Id.* at 1043 (emphasis added). This Court explained:

> "[E]ven when a witness has been coerced into providing the police with a pretrial statement that implicates the accused, the mere fact that a witness has given the police such a statement during the investigation of a crime does not necessarily prevent the witness from testifying voluntarily at trial in a manner consistent with the pretrial statement. As we said in *State v. Damiano,* 587 A.2d 396, 399 (R.I.1991): 'We know

of no precedent from the Supreme Court of the United States that would require a jury to ignore the testimony of a live witness on the basis of having a reasonable doubt concerning whether a prior statement containing the substance of such testimony had been produced by coercion.'" *Garcia,* 743 A.2d at 1043–44.

The hearing justice was bound (as am I) to follow this Court's decision in *Garcia.* Had he done so, he would have been obliged to reject Tempest's witness-coaching claim. If the Due Process Clause is not offended when police coerce a statement from a witness, I cannot fathom how it would be offended when police coach, but do not go so far as to coerce, a witness.

Under *Garcia,* a criminal defendant is not powerless to combat the effects of the manner in which police interview witnesses. Instead, "[c]ross-examination and [closing] argument are the primary tools for addressing improper witness coaching." *United States v. Sayakhom,* 186 F.3d 928, 945 (9th Cir.1999); *cf. Perry v. New Hampshire,* —— U.S. ——, 132 S.Ct. 716, 723, 181 L.Ed.2d 694 (2012) ("The Constitution * * * protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit."). Defense counsel wielded those tools with precision in this case, subjecting witnesses to devastating cross-examination on whether their testimony was simply the product of Pennington's suggestion and asserting in closing argument that Pennington shaped witness testimony to make the puzzle pieces fit. This is the nature of our adversary system of justice.

Additionally, an effort to combat witness coaching need not end when a guilty verdict is returned. As occurred in this case,

a defendant can file a motion for a new trial, asking the trial justice to "sit[ ] as the legendary thirteenth juror" and independently weigh the evidence and assess witness credibility. *State v. Covington,* 69 A.3d 855, 862 (R.I.2013) (quoting *State v. Smith,* 39 A.3d 669, 673 (R.I.2012)). In the event that a trial justice agrees that improper police conduct sufficiently mars the credibility of an important witness or several witnesses, he or she is empowered to grant the motion. The trial justice's grant or denial of such a motion is reviewable by this Court, thereby providing yet another opportunity to subject alleged police misconduct to judicial scrutiny. This is the heart of our system's check on witness credibility and where the question of witness coaching rests. Credibility decisions should not be susceptible to a "second look" by a different justice.

To the extent that a standard has emerged elsewhere for evaluating due process claims of witness coaching by police, it bears no resemblance to the hearing justice's decision. For example, in *Wilcox v. Ford,* 813 F.2d 1140, 1147–48 (11th Cir. 1987), the Eleventh Circuit held that, to the extent that a due process claim that the police engaged in improper conduct in order to secure incriminating statements from witnesses is even cognizable, it must meet the test of *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), which requires a showing that the conduct "is so outrageous that it violates 'fundamental fairness, shocking to the universal sense of justice.'" *Wilcox,* 813 F.2d at 1147 (quoting *Russell,* 411 U.S. at 432, 93 S.Ct. 1637). This is a substantive due process violation. The court explained that the standard is met only "in the 'rarest and most outrageous circumstances.'" *Id.* (quoting *United States v. Tobias,* 662 F.2d 381, 387 (5th Cir.1981)).

This case does not come close to meeting this standard.

Finally, at the risk of gilding the lily, I remain troubled by the manner in which the hearing justice addressed Tempest's witness-coaching claim. In my opinion, the hearing justice approached the question of whether Tempest's conviction must be vacated on due process grounds as if it were a garden-variety negligence claim. He allowed expert testimony on the standard of care (proper police practices and procedures), and he relied on Davis's testimony to establish that the police breached that standard with respect to Richards, LaDue, and Shaw. In what can only be characterized as an extraordinarily irregular proceeding, the hearing justice went so far as to fault the state for not putting on its own expert testimony: "[T]he [s]tate put forth no expert of its own to rebut the opinions offered by * * * Davis." Since when does the constitutional question of whether the Due Process Clause was violated require a battle of the experts? This is not a negligence case, and, when determining whether the Due Process Clause has been violated, "we must never forget, that it is *a constitution* we are expounding." *Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (quoting *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819) (Marshall, C.J.)).

For these reasons, I am of the opinion that the hearing justice erred when he granted Tempest postconviction relief on his witness-coaching claim. It is my belief that, on remand, the trial justice to whom this case is assigned should not exclude the testimony of Richards or LaDue on this basis.

### Conclusion

Tempest is not entitled to postconviction relief. The hearing justice failed to follow the appropriate legal standard and clearly erred in determining that the former prosecutor's nondisclosure of the Carrier statements constituted a deliberate nondisclosure under the *Wyche* doctrine. Rather than acknowledge this error, the majority improperly makes its own findings of fact—which are also clearly erroneous—to support the hearing justice's conclusion. The record, however, simply does not support the conclusion that there was a deliberate nondisclosure of the Carrier statements. Additionally, Tempest's McMann evidence *Brady* claim is barred by the doctrine of laches and also must fail on the merits because the McMann evidence is not material. Finally, Tempest's witness-coaching claim must be rejected because it is barred by principles of *res judicata* and fails on the merits under the controlling legal standard.

Tempest received a fair trial. His conviction should not be disturbed. The Picard family has been deprived of what little justice they received in 1992, ten years after they buried their young, innocent daughter.